MICHIGAN WISCONSIN PIPE LINE COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

Natural Gas Pipeline Company of America, Intervenor.

No. 74–1450.

United States Court of Appeals, District of Columbia Circuit.

Argued April 21, 1975.

Decided Sept. 29, 1975.

---

Richard J. Flynn, Chicago, Ill., with whom Frederic G. Berner, Jr., and Charles V. Shannon, Washington, D. C., were on the brief for petitioner.

A. Lee Wallace, Atty., F.P.C., for respondent. Drexel D. Journey, Acting Gen. Counsel, George W. McHenry, Jr., Sol., and Arthur E. Gowran, Atty., F.P.C., were on the brief for respondent. John R. Staffier, Atty., F.P.C., also entered an appearance for respondent.

Paul E. Goldstein and Paul W. Mallory, Chicago, Ill., were on the brief for intervenor.

Before TAMM and MacKINNON, Circuit Judges, and JAMESON,* Senior United States District Judge for the District of Montana.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This case presents yet another chapter in the Federal Power Commission's ongoing effort to implement its advance payments program. The specific controversy here concerns the rejection by the Commission of rate base treatment for a particular advance payment made outside of the "lower 48 states." Because we find the Commission's approach in taking this action deficient in several respects, we must remand the case to it for further consideration.

I

Advance payments, a relatively recent innovation, are essentially monies loaned by pipeline companies to their suppliers for the purpose of providing the ready capital necessary to stimulate production of natural gas. Funds so advanced are repaid either in kind or, preferably, in gas. In late 1970 the Commission determined that pipeline companies should be allowed to receive rate base treatment on advance payments:

It is the Commission's view that, particularly at the present time when there are indications of a natural gas shortage, it is not in the public interest for pipeline companies to bear the cost of assuring themselves and their customers of a future supply of natural gas. We believe that, when it is necessary for pipeline companies to make advance payments in order to contract for gas supplies, it is equitable that the companies should earn on the amounts advanced.

Order No. 410, 44 FPC 1142, 1144 (1970). Prompted by petitions for rehearing of Order No. 410, the Commission issued Order No. 410-A which reaffirmed rate base treatment for advance payments but modified some of the particular accounting procedures. Order No. 410-A, 45 FPC 135 (1971). Simultaneously with the issuance of Order No. 410-A the Commission initiated an advance payments rulemaking proceeding, Docket No. R-411, to develop further specifics

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

of the advance payments program. 36 Fed.Reg. 377 (1971). This proceeding culminated in Order No. 441, 46 FPC 1178 (1971).

In Order No. 441, the Commission again articulated the policy underlying rate base treatment of advance payments:

A critical shortage of gas exists in the United States; capital formation for gas development is difficult. The objectives of providing capital to accelerate the addition of new gas supplies supports our continuation for the limited period of the rate treatment of advance payments provided herein. We recognize that the just and reasonable area rates for independent producers will hopefully alleviate this gas supply shortage over the long run; however, for the immediate term, (namely through 1972) our advance payments policy has been designed to increase directly the funds available for the necessary exploration and developmental effort. . . .

All advances made under contracts executed prior to the issuance of this order shall receive rate treatment in accordance with the provisions of Order Nos. 410 (44 FPC 1142) and 410–A (45 FPC 135) in Docket No. R–380. Advances made under contracts executed on or after the date of issuance of this order shall be treated as ordered herein.

*Id.* at 1180. The Commission concluded that advances "shall be included in rate base where such payments are reasonable, necessary and appropriate in order to contract for gas supplies by agreement executed not later than December 31, 1972." However, rate base treatment was conditioned upon three factors: (a) that the advances be repaid in full by delivery of gas or other consideration, (b) that the advances not be used for exploration or lease acquisition, and (c) that the pipeline not obtain a "working interest" in the producing venture. *Id.* These orders, 410, 410–A, and 441, were reviewed by this court in *Public Service Commission for State of New York v. FPC*, 151 U.S.App.D.C. 307, 467 F.2d 361 (1972), where Judge Wilkey thoroughly analyzed the orders briefly summarized herein and affirmed the Commission, concluding that:

In this very difficult area of rate-making, when it is uncertain what will be the ultimate agency determination, and when it is yet unknown what will be the results and ramifications of the experimental policies adopted by the agency, we feel that the FPC has demonstrated, as adequately as can be expected under the circumstances, the basis for its actions, and we may thus defer to the expertise of the FPC in this matter.

*Id.* at 367 (footnote omitted).

Relatively shortly after *Public Service*, the Commission gave notice of a proposed rulemaking in Docket No. R–466 entitled Advances to Suppliers for Gas Outside Continental United States. 38 Fed.Reg. 1055 (1972). The need for such a proceeding was manifest, for none of the Commission's prior orders specifically addressed the issues concerning accounting and rate treatment of advances in the "frontier areas" of Alaska and Canada. The Commission stated that it was considering two alternative resolutions to the problem and that until an order issued from the Docket No. R–466 proceeding, "all advances in this area . . . shall be treated on a *case by case basis.*" *Id.* at 1056 (emphasis added). To date, no final order has been issued in the R–466 proceeding. The foregoing discussion describes the regulatory framework in which the case at bar arose; we now turn to the facts of this case and the Commission's actions in regard to it.

II

On March 24, 1972, the Michigan Wisconsin Pipe Line Company ("Michigan Wisconsin") entered into an agreement with Imperial Oil Limited and Imperial Oil Enterprises Limited (collectively referred to as "Imperial"), providing for the development and production of gas

in the Mackenzie Delta, an area located in the Northwest and Yukon Territories of Canada. J.A. 166–78. By its terms, the agreement obligated Michigan Wisconsin to advance Imperial a total of $20,000,000 over a period of four years, $5,000,000 per year, commencing in 1972. Michigan Wisconsin was further obligated to advance Imperial "Two Cents (2¢) per Mcf of such portion of the recoverable gas reserves from the Designated Acreage as are contracted to be sold, and authorized for export and import, to Michigan Wisconsin." *Id.* at 168. For its part, Imperial agreed to develop not less than 12 trillion cubic feet of recoverable gas reserves, of which 5 trillion were to be sold to Michigan Wisconsin. *Id.* at 169. Notably, the agreement was carefully crafted so as to comply fully with Order No. 441 in that: (1) all advances are to be completely repaid; (2) Michigan Wisconsin gains no working interest in the venture; and (3) the advances could only be used for development and production of gas. *Id.* at 170–72.

Michigan Wisconsin filed a proposed rate increase, including *inter alia* the Imperial advance, on June 2, 1972. The Commission accepted the filing and approved the proposed rate increase except as it reflected the Imperial advance and another advance not at issue here. Recognizing that its prior orders had not specifically dealt with advances beyond the lower 48 states, the Commission determined that a hearing should be commenced to decide whether Michigan Wisconsin's advance to Imperial should be permitted as part of the requested rate increase. *Id.* at 267–71.

The hearing was conducted before Administrative Law Judge Ellis, who issued his decision on January 22, 1973. He initially summarized the case:

In this, the first decisional confrontation with the Arctic-North Slope gas production program, the Commission is asked to approve and validate a rate increase (now in effect) which includes a certain component for advance payments to the producers for gas expected to be developed, then to be brought to the United States in a pipeline expected to be designed, built and paid for, all under authorization expected to be obtained from the government of Canada.

51 FPC 394. While this introduction ostensibly foreshadowed a ruling contrary to Michigan Wisconsin, such was not the case, for Judge Ellis ultimately concluded that the advance to Imperial was " 'reasonable, necessary and appropriate' and it is approved." *Id.* at 405. The precise bases for this conclusion merit further discussion, especially the analysis of the degree to which gas could be expected to flow for the benefit of Michigan Wisconsin's customers.

Four considerations were paramount to the ALJ's decision: (1) the pipeline to be constructed; (2) the gas to be developed; (3) Michigan Wisconsin's need for such gas; and (4) Canadian export authorization. The "Arctic gas pipeline" was described as a 48-inch diameter line, approximately 2,500 miles long and capable of delivering up to 3.5 billion cubic feet of gas per day when fully powered. Its cost would be over 5 billion dollars, its estimated completion date 1978. *Id.* at 398. It would span Canada from the frontier region to the Canadian-United States border at the Midwest. *Id.* The evidence detailed all of the groundwork planning and various studies that had been conducted, for example, engineering design and cost studies, environmental and sociological studies, and finance and economic studies. *Id.* at 398–99, 401–02. The staggering magnitude of the Arctic gas pipeline project is illustrated by testimony that it was "one of, if not the, largest undertaking in the history of private enterprise." *Id.* at 402. Nonetheless, the ALJ and the Commission's staff agreed that preparation for the task was exceptional and certainly conducive to success.

Although the testimony concerning the pipeline itself is important, an equally pivotal consideration concerned the quantity of potential gas available for development. To this end, the evidence

indicated that, although "[g]as reserves data for the Mackenzie Delta acreage are not available, . . . 15 trillion cubic feet may be considered a *minimum* figure," and that the "potential maximum amount of reserve is strictly open-end[ed]." *Id.* at 403 (emphasis added). These facts are relevant for two reasons. First, they show that substantial amounts of gas are very likely to flow from the Mackenzie Delta area. Second, when combined with the estimated 20 trillion cubic feet of pipeline quality proven resources in the Prudhoe Bay Field, which the Arctic gas pipeline would also service, and testimony that the pipeline would require about 25 trillion cubic feet to be economically feasible, they indicate that operation of the pipeline is indeed economically feasible.

Also central to the ALJ's opinion was Michigan Wisconsin's unquestionable need for the Canadian gas. It is quite obvious from the evidence presented that Michigan Wisconsin will, without this gas, be facing critical supply shortages in the near future. *Id.* at 403–04. Finally, the ALJ was concerned that even assuming bountiful supplies of gas and a completed pipeline to transport it, the Canadian government might not grant export authorization. "The policy of the Canadian National Energy Board [NEB] is to allow exportation only of those volumes of natural gas which are surplus to Canada's own requirements, and such surpluses have recently been found by the N.E.B. not to exist." *Id.* at 400. However, Michigan Wisconsin offered three reasons, which the ALJ found persuasive, as to why export authorization could reasonably be expected:

First, the Canadian markets cannot absorb at one time the very large volumes of gas to be transported through the Arctic gas pipeline (over 2 billion cubic feet per day when deliveries began). Because the economic feasibility of the line depends upon the transportation of these large volumes from the outset of operations, exportation of large volumes of gas to the United States will thus be essential. Second,

the addition of large new reserves in the Arctic, which have not previously been considered by the National Energy Board in calculating the Canadian surplus, will result in a substantial surplus over Canadian requirements. Third, because Arctic gas will necessarily be considerably more expensive when delivered at the city gate than gas produced in Alberta, it is probable that the National Energy Board will give priority to Alberta and British Columbia gas for delivery to Canadian markets and will authorize the export of the Arctic gas.

J.A. 33–34; *see* 51 FPC 400–01.

On this evidentiary record the ALJ concluded:

The various difficulties recited are being vigorously attacked, and the array of means and methods derived to overcome them is demonstrated, impressive, and unexceptionable. Finally, the long-range need of the pipe line is clear, as well as the need to make advance payments to get results, and there can be no judgment but that the individual customers are better served with this assessment of perhaps one mill per Mcf than to face gas starvation only five or ten years hence.

Specifically, the $5 million advance to Imperial Oil meets the tests and objectives of the Commission's Order No. 441, 46 FPC 1178, since the advance is to be repaid, gas or no gas, there is no working interest owned by the pipe line, and it gives promise of eliciting a very significant gas supply. The program so designed has judicial sanction. The pipeline's need is unquestionable, the pipeline's program is rational, reasonable, and designed along lines inevitably necessary to give promise of results. The staff is satisfied with the preliminary showing of the nascent pipeline-to-be and its practicality, concluding there is a "reasonable expectation that frontier gas can be brought to market."

Hence the advance payment to Imperial Oil was "reasonable, necessary and appropriate" and it is approved.

51 FPC at 405 (footnote omitted), *citing Public Service Commission of New York v. FPC, supra.*

Our review of the hearing, the evidence, the ALJ's repeated and incisive questioning of the witnesses, and the Initial Decision itself leaves us with the clear impression that the ALJ's decision resulted from a most studious and comprehensive analysis of all relevant data and Commission pronouncements. Unfortunately, we cannot say the same for the Commission's decision, to which we now turn.

Upon review of Administrative Law Judge Ellis' Initial Decision, the Commission denied Michigan Wisconsin rate base treatment on the Imperial advances. The sole rationale articulated by the Commission for its decision was that:

> Inclusion in the rate base of the amount advanced to Imperial for Canadian gas would be contrary to the principle enunciated in *Texas Eastern Transmission Corporation,* Opinion No. 672, 50 FPC 1419 (November 1, 1973), clarified by Opinion No. 672–A, 51 FPC 258 (January 15, 1974).

Opinion No. 685, 51 FPC 391, 392–93 (1974). The Commission denied Michigan Wisconsin's application for rehearing and reconsideration with the brief note that:

> This Commission recognized in *Texas Eastern,* [50 FPC 1419 and 51 FPC 258], that the policies by the Canadian National Energy Board have made it unlikely at this time, that any new gas from Canadian producers will flow to the United States for use by domestic customers. . . . As noted in Opinion No. 685, we found that this *Texas Eastern* principle was equally applicable to [Michigan Wisconsin's] Canadian advances in this proceeding.

Order Denying Rehearing and Reconsideration, 51 FPC 1133–34 (1974). Michigan Wisconsin filed a petition for review in this court, challenging Opinion No. 685 and the subsequent order denying rehearing. Natural Gas Pipeline Company, a party throughout the Commission proceedings, intervened.

### III

The Commission purports to have decided the instant case by applying a "principle" which was developed in a prior adjudicatory proceeding. Of course, if this were in fact all that the Commission had done, then we would have no quarrel with it. There is no question that the Commission may attach precedential, and even controlling weight to principles developed in one proceeding and then apply them under appropriate circumstances in a stare decisis manner. However, a rudimentary prerequisite to such an application is that the factual composition of the case to which the principle is being applied bear something more than a modicum of similarity to the case from which the principle derives. This is not to say that factual patterns must be virtually identical for a principle to control, but rather that there is a point where the patterns are so diverse that a per se application of the principle, without at least recognition and accommodation of the factual distinctions, brings into question the rationality of the application. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) ("The agency must articulate a 'rational connection between the facts found and the choice made.' "). We think that the Commission has crossed this point in the case *sub judice.* To put it in more traditional terms, the Commission's bare application of the *"Texas Eastern* principle" to the *Michigan Wisconsin* proceeding without recognition of the substantial differences between the two cases, nor without even so much as a passing comment upon the uncontradicted record evidence of NEB's projected intentions as proffered by Michigan Wisconsin, simply is not reasoned decision-making. *See, e. g., Macdonald v. FPC,* 164 U.S.App.D.C. 248, 505 F.2d 355, 363 (1974); *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841, 850–51 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).

In *Texas Eastern*, the Texas Eastern Transmission Corporation sought rate base treatment for an advance payment made to its wholly owned subsidiary, Texas Eastern Canada Ltd., pursuant to an agreement entered into on August 5, 1971. Actually, the agreement was first entered into on September 22, 1970, between a Texas Eastern affiliate and Mobil Oil Canada Ltd. and was "shuffled" to Texas Eastern. 50 FPC at 1421. The advance was "for exploration and development on 12,000,000 acres in the Sable Island Area offshore Nova Scotia, Canada." *Id.* Essentially, the Commission denied rate base treatment because the advance payment arrangement was unreasonable and because there were no assurances that the Canadian Government would allow exportation of the gas, and thus, little likelihood of benefit to American ratepayers. *Id.* at 1424–26; *see* 51 FPC 258 (1974); 51 FPC 967 (1974).

A division of this court recently reviewed the Commission's decisions in *Texas Eastern* and noted that the "opinions of the FPC are confusing in certain respects . . . ." *Texas Eastern Transmission Corp. v. FPC*, 171 U.S.App. D.C. 25 at 26, 517 F.2d 1299, 1300 (1975). However, because the court was "able to discern the main path," it affirmed. One particularly relevant aspect of the court's holding is that Texas Eastern could not "stake out a claim of reliance on the policy statements of the Commission" since it had "entered into its agreement with [Mobil] prior to the issuance of the first FPC order on the treatment of advance payments." *Id.*, 171 U.S.App.D.C. at 26, 517 F.2d at 1300.

Several distinctions between *Texas Eastern* and *Michigan Wisconsin* are readily ascertainable. First, since Michigan Wisconsin did not enter into its agreement with Imperial until after the Commission had issued Orders 410, 410–A, and 441, the presumption that Michigan Wisconsin cannot claim reliance does not arise. Second, Texas Eastern clearly had an interest in the Canadian market through its wholly owned subsidiary; the Commission even noted "the transparency of the corporate scheme to obtain the benefit of the rate base treatment and at the same time exclude from the rate payers the benefits of selling the gas [Texas Eastern] produced to the Canadians." 50 FPC at 1426. We cannot help but think that this factor weighed heavily in the Commission's *Texas Eastern* decision. Contrariwise, Michigan Wisconsin clearly has no working interest in the Canadian venture, and the record does not indicate any other interest even remotely comparable to Texas Eastern's. Third, Texas Eastern's application for rate base treatment was, contrary to Michigan Wisconsin's, opposed by the staff and denied by the ALJ. Finally, and most importantly, the Commission's analysis of the Canadian National Energy Board's "policy" toward exports verged on nonexistence. The Commission did not address *at all* Michigan Wisconsin's uncontradicted evidence that the NEB's export policy as articulated by the Commission did not consider any of the frontier gas developments in its calculations of Canadian surpluses. The Commission simply turned a deaf ear to Michigan Wisconsin's testimony that Canadian markets could not absorb the large volumes of gas that the Arctic gas pipeline would deliver and that the NEB would give priority to Alberta and British Columbia gas for delivery to Canadian markets because of cost factors.

Rather than confront these queries directly, it appears that the Commission merely affixed the possibly dubious imprimatur of *Texas Eastern* and sent the parties on their way. Without a more elaborate explication, we cannot affirm the Commission's orders, and thus, must remand the case for further consideration. In doing so, we do not intend to intimate any view as to the ultimate outcome of the case; we do expect, however, that the Commission will determine that degree of certainty of export to be required before according advance payments rate base treatment, and whether Michigan Wisconsin has met that stan-

dard. Of course, on remand the Commission will have full discretion to resolve not only issues raised herein, but also any other relevant issues it may deem appropriate. We are confident that the Commission's expertise, once applied and articulated, will allay any trepidation we have expressed.

*Remanded.*