## ALEXANDER T. ARTHURS vs. BOARD OF REGISTRATION IN MEDICINE.

Suffolk. December 4, 1980. — April 3, 1981.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Narcotic Drugs. Physicians and Surgeons. Board of Registration in Medicine. Administrative Law*, Substantial evidence, Adjudicatory proceedings, Decision. *Constitutional Law*, Ex post facto law, Double jeopardy. *Entrapment.*

In a proceeding before the Board of Registration in Medicine, evidence that a physician's prescriptions for controlled substances were not recorded on patient cards or were recorded on the wrong patient cards and that such substances were prescribed at short intervals in quantities in excess of the dosage directed by the physician, taken together with evidence surrounding the facts and circumstances of the prescriptions, amply supported the board's conclusion that the physician had prescribed controlled substances for other than a legitimate medical purpose, in violation of G. L. c. 94C, § 19 (a). [304-309]

Findings by the Board of Registration in Medicine that a physician's record-keeping and certain of his medical practices were deficient in some respects could not properly be based on the expertise of the board members in such matters in the absence of any evidence supporting those findings. [309-310]

A conclusion by the Board of Registration in Medicine that a physician had prescribed controlled substances for other than legitimate medical purposes was a reasonable inference to be drawn from the evidence on the basis of common experience and common sense and did not require specialized or technical knowledge. [311-312]

In determining whether a physician had prescribed controlled substances for other than legitimate medical purposes, the Board of Registration in Medicine was entitled to rely on standards established by it in a previously adjudicated case and was not required to adopt those standards through rule-making before applying them; nor was the application of those standards improper merely because the physician's conduct giving rise to the charges occurred before adjudication of the case in which the standards were set forth. [312-315]

The Board of Registration in Medicine was not required to respond to objections to a recommended decision of a hearing officer or to provide a

statement of reasons for overruling the objections; nor was it required to review the hearing transcript before ruling on the objections. [315-316]

The Board of Registration in Medicine was not barred on double jeopardy grounds from disciplining a physician on charges which had previously been the subject of criminal proceedings against him. [316-317]

There was nothing in the record of a proceeding before the Board of Registration in Medicine to support a physician's contention that the conduct of an undercover detective in obtaining prescriptions for controlled substances constituted entrapment. [317-318]


CIVIL ACTION commenced in the Superior Court Department on June 11, 1979.

After transfer to the Supreme Judicial Court for the county of Suffolk, the case was reported by *Kaplan*, J.

*David Berman* for the plaintiff.

*Paul W. Johnson*, Assistant Attorney General (*Carolyn V. Wood*, Assistant Attorney General, with him) for the defendant.

ABRAMS, J.  The plaintiff Alexander T. Arthurs, a physician licensed by the Commonwealth, seeks judicial review of the decision of the Board of Registration in Medicine (board), revoking his license to practice medicine in the Commonwealth of Massachusetts.  The board found that Arthurs prescribed controlled substances for other than a legitimate medical purpose, in violation of G. L. c. 94C, § 19 (a).

The plaintiff claims that (1) the board's decision is unsupported by substantial evidence; (2) the board erred by basing its decision on one of its adjudicatory opinions decided after Arthurs's conduct had occurred; (3) the board erred in its treatment of Arthurs's objections to the recommended decision of a hearing officer; (4) the doctrine of double jeopardy bars the board's disciplinary proceeding on the ground that Arthurs was acquitted in the Superior Court of charges growing out of the same conduct; and (5) that the disciplinary proceedings are barred on the ground of entrapment.  We conclude that the decision of the board should be upheld.

On October 1, 1976, the board issued an order to show cause,[1] pursuant to G. L. c. 112, § 5,[2] charging Arthurs with issuing prescriptions for controlled substances for other than a legitimate medical purpose, in violation of G. L. c. 94C, § 19 (a).[3] Arthurs moved for specification of the charges, and the board detailed its allegations against him in a document entitled "Further Specifications." In essence, the board charged Arthurs with unlawfully prescribing controlled substances for five persons on fifty-six occasions. Arthurs then challenged the right of the board to deny him a continuance of the disciplinary proceedings during the pendency of criminal charges against him arising from some of the same conduct.[4] After those proceedings

---

[1] Section 1.01:(2) of the rules of procedure governing the board's disciplinary proceedings defines an "Order to show cause" as: "a paper served by the Board upon a registrant ordering the person to appear before the Board for an adjudicatory proceeding." 243 Code Mass. Regs. 1.01:(2) (1979). The board's regulations governing disciplinary proceedings are currently codified at 243 Code Mass. Regs. 1.00 et seq. (1979). They were previously printed, with different numeration, at Mass. Reg. issue No. 12, at 18-33 (1976). We will refer to the regulations as currently codified, which are in substance the same as the earlier version.

[2] General Laws c. 112, § 5, as amended through St. 1980, c. 213, provides: "The board may, after a hearing pursuant to chapter thirty A, revoke . . . the certificate of registration . . . [of] a physician . . . upon proof satisfactory to a majority of the board that said physician: — . . . (b) is guilty of an offense against any provision of the laws of the commonwealth relating to the practice of medicine, or any rule or regulation adopted thereunder." Although G. L. c. 112, § 5 (b), was enacted after Arthurs's conduct occurred, that section merely repeats G. L. c. 112, § 61, which provides that "each board of registration . . . after a hearing, may, by a majority vote of the whole board, suspend, revoke, or cancel any certificate, registration, license or authority issued by it, if it appears to the board that the holder . . . is guilty . . . of any offence against the laws of the commonwealth." Arthurs correctly does not claim any error in the citation of G. L. c. 112, § 5.

[3] General Laws c. 94C is the Controlled Substances Act. Section 19 (a), as amended through St. 1972, c. 806, § 15, provides, in pertinent part: "A prescription for a controlled substance to be valid shall be issued for a legitimate medical purpose by a practitioner acting in the usual course of his professional practice."

[4] Arthurs requested a continuance of the proceedings until the conclusion of criminal cases pending in Superior Court in Middlesex County arising from

terminated in the board's favor, the board held a hearing on its charges. In a "Recommended Decision," the hearing officer,[5] who conducted that hearing,[6] found that Arthurs had prescribed controlled substances for other than a legitimate medical purpose for three persons on numerous occasions.[7] The hearing officer concluded that in the prescribing of controlled substances, Arthurs failed to meet the minimum standards of proper medical practice suggested in a 1978 opinion by the board. *Matter of Baer*, Adjudicatory Case No. 205 (July 14, 1978).

After Arthurs made written and oral objections[8] to the recommended decision, the board issued a final order revok-

---

some of the same facts. That motion was denied at a hearing on November 18, 1976, on the ground that G. L. c. 112, § 63, specifically requires the board to go forward with administrative charges regardless of the pendency of criminal charges. Arthurs then challenged the constitutionality of G. L. c. 112, § 63, in the United States District Court for the District of Massachusetts. By order dated February 1, 1977, and opinion dated March 3, 1977, the court declared G. L. c. 112, § 63, unconstitutional and enjoined the hearing officer from further reliance on it. *Arthurs* v. *Stern*, 427 F. Supp. 425 (D. Mass. 1977).

On August 16, 1977, the United States Court of Appeals for the First Circuit reversed the judgment of the District Court and permitted the administrative proceeding to resume. *Arthurs* v. *Stern*, 560 F.2d 477 (1st Cir. 1977), cert. denied, 434 U.S. 1034 (1978).

[5] See G. L. c. 7, § 4H, as amended through St. 1980, c. 579, § 60, which establishes the Division of Hearings Officers in the Executive Office for Administration and Finance. Any "agency of the commonwealth authorized to conduct adjudicatory proceedings . . . may . . . request the division to conduct . . . such proceedings . . . on behalf of . . . [the] agency." Hearing officers must "be members of the bar of the Commonwealth and . . . shall have had trial experience."

[6] The regulations governing the disciplinary proceedings of the board provide that all hearings shall be conducted by the board, "or a hearing officer designated by it." 243 Code Mass. Regs. 1.04:(7) (1979).

[7] The hearing officer recommended that the board dismiss the remaining charges against Arthurs. Since the board's final order adopted the recommended decision as the basis for its decision, those charges are deemed dismissed.

[8] In his brief to the hearing officer, Arthurs claimed that as to one patient, an undercover officer, the disciplinary proceedings were (1) not supported by substantial evidence and (2) barred because he was en-

ing Arthurs's certificate of registration to practice medicine
in the Commonwealth of Massachusetts. The board stated
that "[a]fter full consideration of the record and the ex-
hibits, the Board adopts the Recommended Decision as the
basis of its decision."[9] It further stated that "[o]n the basis
of the findings of fact enumerated in the Recommended
Decision, and for reasons similar to those set forth in detail
in *In the Matter of Arthur E. Baer, M.D.,* . . . the defend-
ant did prescribe controlled substances for other than a
legitimate medical purpose."

The specific findings made by the board are that: (1) Ar-
thurs issued, without explanation, repeated refill prescrip-
tions for controlled substances over relatively short periods
of time; (2) Arthurs failed to exercise minimum care in
preventing persons from obtaining multiple prescriptions
from him for controlled substances under different
pseudonyms; (3) Arthurs failed to exercise minimum care in
obtaining and recording the addresses of patients for whom
he was prescribing controlled substances over extended
periods of time; and (4) Arthurs repeatedly failed to record
an appropriate medical history, and to record an ap-
propriate physical examination, in instances where con-
trolled substances were prescribed.

The board concluded that, "[f]rom the extensive evidence
submitted, it is clear that [Arthurs's] behavior was not an
isolated incident or oversight, but a pattern of intentional or

---

trapped by the officer. Arthurs claimed that the disciplinary proceedings
in their entirety were barred by principles of double jeopardy. Arthurs
made a number of additional claims in his objections to the recommended
decision. He claimed that many of the hearing officer's conclusions
related to charges never specifically made, namely that Arthurs failed to
maintain adequate records, that he issued prescriptions at less than proper
intervals, that he failed to question patients closely before issuing
prescriptions for controlled substances, that he failed to schedule return
office visits for his patients, and that he failed to take adequate note of the
addresses of his patients. Arthurs also argued that the hearing officer's
conclusions on these points were unsupported by substantial evidence.

[9] Hereinafter, we shall refer to the decision as the board's decision since
it is that decision which is subject to judicial review.

negligent practice."[10] Arthurs then filed his complaint for judicial review. G. L. c. 112, § 64.[11]

1. *The substantiality of the evidence.* Arthurs claims that the decision of the board is unsupported by substantial evidence, and therefore must be set aside. G. L. c. 30A, § 14 (7) (*e*). "'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). Initially, we note the limited nature of our review under the substantial evidence standard. While we must consider the entire record, and must take into account whatever in the record detracts from the weight of the agency's opinion, *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966), as long as there is substantial evidence to support the findings of the agency, we will not substitute our views as to the facts. *Martin* v. *Director of the Div. of Employment Security,*

---

[10] In June, 1974, Arthurs was tried and acquitted on a Federal indictment charging him with prescribing Desoxyn and Seconal not in the course of his professional practice. *United States* v. *Arthurs*, No. 74-23-M (D. Mass., June 19, 1974). The board found that Arthurs was on notice of the care required in prescribing controlled substances by a prior trial on similar charges.

[11] On June 11, 1979, Arthurs filed a complaint in the Superior Court in Middlesex County seeking judicial review of the decision of the board. Although G. L. c. 112, § 64, provides for judicial review of the board's decision in the Supreme Judicial Court, the board did not move to dismiss. See Mass. R. Civ. P. 12 (b)(1) and (h)(3), 365 Mass. 754 (1974). Rather the board petitioned the single justice to transfer the action pursuant to G. L. c. 211, § 4A. By an order dated June 14, 1979, a single justice transferred the action. The physician then moved that the single justice stay the board's order; the physician similarly moved that the board stay its own order pending the completion of the proceeding for judicial review. The board allowed this motion on the ground that it was unable to provide a transcript of the administrative hearing; it stayed its disciplinary order until ten days after it would have filed its answer.

The board filed its answer to Arthurs's complaint on July 28, 1980, incorporating the documentary record as well as the transcripts of the disciplinary proceeding. The parties then filed cross motions for summary judgment. After hearing argument on these cross motions, a single justice reserved and reported the case for decision of all issues by us. Upon Arthurs's motion, the board subsequently stayed its disciplinary order until fifteen days after the issuance of a rescript from this court.

347 Mass. 264 (1964). *McCarthy* v. *Contributory Retirement Appeal Bd.*, 342 Mass. 45 (1961). There must, however, be substantial evidence in the record to support the findings of the board. While the board is free to evaluate evidence in light of its expertise, it cannot use its expertise as a substitute for evidence in the record. We are concerned with how the board arrived at its decision and with the evidence on which it relied.

We summarize the facts found by the board. A. *Charles Jackson and David Jackson.*[12] A black male weighing approximately 300 pounds and standing approximately six feet, three or four inches, tall, established a patient relationship with Arthurs under the names Charles Jackson and David Jackson. On six days this patient visited Arthurs twice, once under each name, and received prescriptions for either Quaalude[13] or Desoxyn, both controlled substances. The board found as a fact that Jackson was "physically prominent" and that "it would be extremely difficult for him to pass himself under two different aliases to the same doctor." At the hearing, Arthurs conceded that Jackson was a distinctive looking individual. The board found that Arthurs "knew or should have known" that David and Charles Jackson were the same person.

---

[12] The person who used the names Charles Jackson and David Jackson was summoned by the board. He was unwilling to testify without his attorney present, and was dismissed to be recalled at a later time. Neither the board nor Arthurs recalled him.

[13] The parties stipulated that "the descriptions of the drugs as found in the Physicians' Desk Reference would govern these proceedings." However, it is unclear from the record what the parties meant by "description." For example, in the Physicians' Desk Reference, in addition to the chemical description of Quaalude, the following comments appear: "Caution must be exercised in administering [Quaalude] to individuals known to be addiction-prone or those whose history suggests they may increase the dosage on their own initiative. Illicit use of the drug or abuse of the drug for nontherapeutic purposes may lead to severe psychological or physical dependence." PDR at 986 (1979). The board does not argue that this warning is included in the stipulation as to the description of the drugs; hence, we do not consider it. The PDR text contained warnings about the dangers of misuse of the other controlled substances prescribed by Arthurs.

From the prescriptions and the patient cards in evidence, the board found that Arthurs had prescribed controlled substances on sixteen occasions for David Jackson, and on at least nine occasions for Charles Jackson. All these prescriptions directed the patients to take one tablet daily. The board calculated that over the ninety-two days covered by the first four prescriptions to Charles Jackson, Arthurs issued prescriptions that exceeded the one tablet daily dosage prescribed to that patient by thirty per cent;[14] over a period of 166 days, Arthurs issued prescriptions to David Jackson that exceeded the directed dosage by forty-five per cent.[15] Arthurs offered no explanation for the excess in the amount of controlled substances prescribed by him, or for his failure to identify a patient for whom he was prescribing controlled substances.[16]

The facts found by the board also indicate that Arthurs failed to record on a patient card four prescriptions for Quaalude, two for David Jackson and two for Charles Jackson. It also found that six prescriptions for controlled substances issued to David Jackson were recorded on Charles Jackson's patient card, and that a prescription for Quaalude for one Margaret Jackson was recorded on Charles Jackson's card.

The patient cards, the board found, showed that Arthurs recorded Charles Jackson's address on his first visit as 108 Pearl Street, Cambridge, and David Jackson's address as 108 Pearl Street, Somerville. The first visit of this patient under his two names occurred on two consecutive days. Arthurs used the two addresses interchangeably thereafter.

---

[14] Arthurs issued thirty unit Quaalude prescriptions for Charles Jackson with directions to take one tablet daily, at intervals of 15, 27, 37, 14, 27, and 39 days.

[15] Arthurs issued Quaalude prescriptions to David Jackson with directions to take one tablet daily, at intervals of 15, 27, 29, 7, 17, 25, 34, and 11 days.

[16] When asked if some of his black patients were obtaining prescriptions by using aliases, Arthurs said, "Black people, I just couldn't tell." The board, correctly, did not credit this feeble excuse.

The board concluded that "[w]hile it is certainly possible to copy or remember part of an address incorrectly, the extended pattern of using 'Cambridge' and 'Somerville' interchangeably on the twenty-five prescriptions in evidence for 'Charles Jackson' and 'David Jackson' raises the question whether Dr. Arthurs here took minimal care to prevent the fraudulent use of controlled substances."

B. *Gail Diamond.*[17] Arthurs issued six prescriptions for Quaalude to a patient known to Arthurs as Gail Diamond. Two of these prescriptions were not recorded on the patient card, and on at least one prescription Arthurs used a different address without making a notation of any change of address on the patient card.

Arthurs's prescriptions directed Diamond to take one tablet daily. Over the forty-nine days covered by the first five prescriptions, the board determined that Arthurs issued prescriptions which exceeded the one tablet daily dosage by 200%. The board concluded that there might be an explanation for one of the surplus prescriptions,[18] but not for the others.

C. *Thomas Price.* Thomas Price[19] was the pseudonym used by a detective from the Massachusetts State Police Diversion Investigation Unit. On Price's first recorded visit, Arthurs prescribed Nembutal but did not indicate a quantity on the patient card. On Price's return visit, Ar-

---

[17] The hearing officer concluded that Gail Diamond was not the true name of Arthurs's patient but that Arthurs knew her as Gail Diamond. The board summoned that person but she declined to answer on advice of counsel, citing the privilege against self-incrimination.

[18] The hearing officer found a notation on Diamond's patient card accompanying one prescription of Quaalude stating "[p]atient was upset [indecipherable] her pills." The hearing officer stated that even if that entry is read to mean that that prescription was a replacement, there was no explanation in the record of subsequent thirty unit prescriptions which were given three, ten and fourteen days following the "replacement" prescription. Arthurs issued prescriptions for Gail Diamond at intervals of only 16, 20, 3, 7, and 4 days.

[19] Price's real name is Thomas Jackson. In order to avoid confusion with the patient who used the names Charles and David Jackson, we shall refer to this individual as Price.

thurs noted that "[p]atient works late as he is a bouncer in a bar room and when he gets home he can't fall asleep." There is no notation of a prescription on that date. Arthurs prescribed Nembutal at bedtime to Price on seven subsequent dates, all of which were noted on the patient card, the last with the notation "may repeat if needed." Arthurs also prescribed Quaalude for him on one occasion. Over the 125 days covered by six prescriptions issued to Price, the board calculated that the number of tablets prescribed exceeded the one tablet daily dosage directed by Arthurs by forty-four per cent.[20] The patient card for Thomas Price does not show any record of any physical examination during any of his nine visits,[21] nor any mention of the patient's present condition after the first two visits; nevertheless, controlled substances were prescribed on all but the second visit.

The findings that prescriptions for controlled substances were not recorded, or were recorded on the wrong patient card, as well as the findings as to the quantity of drugs prescribed at short intervals to patients in excess of Arthurs's specific directions to take one tablet daily, all support the board's conclusion that Arthurs prescribed controlled substances for other than a legitimate medical purpose.[22]

---

[20] After Price's original visit, he was issued Nembutal prescriptions at intervals of 26, 21, 18, 24, 13, and 21 days.

[21] During the proceedings, testimony from Price that Arthurs had not conducted a physical examination of him was directly contradicted by Arthurs. The hearing officer did not make any finding concerning the credibility of either Price or Arthurs on this issue. The only finding concerning that testimony was that the results of a physical examination, if any, had not been recorded. A hearing officer who hears evidence in a contested adjudicatory proceeding should make credibility determinations whenever necessary, no matter how difficult. Since the issue of whether a physical examination was conducted is not particularly relevant to the board's primary concerns, the failure to make these determinations does not require reversal.

[22] Our review of these findings does not require the use of specialized knowledge. It requires only an examination of the board's findings as to the dosage and frequency of Arthurs's prescriptions, the prescriptions Arthurs failed to record on his patient cards, and a review of the testimony

"The issuing of additional prescriptions . . . at short intervals . . . could [be] found to be inconsistent with accepted medical treatment and support an inference that the prescriptions were not intended to serve a medical purpose." *Commonwealth* v. *Comins*, 371 Mass. 222, 233 (1976), cert. denied, 430 U.S. 946 (1977). See *United States* v. *Smurthwaite*, 590 F.2d 889, 892 (10th Cir. 1979); *United States* v. *Rosen*, 582 F.2d 1032, 1036 (5th Cir. 1978); *United States* v. *Bartee*, 479 F.2d 484, 489 (10th Cir. 1973).

The board also could find that Arthurs prescribed controlled substances not in the usual course of his medical practice and acted other than for a legitimate medical purpose "from evidence . . . *surrounding the facts and circumstances of the prescriptions*" (emphasis supplied). *United States* v. *Rogers*, 609 F.2d 834, 839 (5th Cir. 1980). See *United States* v. *Larson*, 507 F.2d 385, 387 (9th Cir. 1974). We conclude that on the above facts and circumstances, the board's decision is amply supported by substantial evidence.

We comment briefly on certain other findings of the board in its decision. The board also found that Arthurs's recordkeeping, and certain of his medical practices, were deficient in some respects. We cannot consider these findings because there is no substantial evidence in the record to support these findings.[23] The board, however, argues that since most of the members of the board are experts, the board can use its expertise without the evidentiary basis of that expertise appearing in the record. "This startling theory, if recognized, would not only render absolute a finding opposed to uncontradicted testimony but would

---

concerning Arthurs's prescribing of controlled substances to David and Charles Jackson. See *supra* at 304-308. We view these as matters of common experience and common sense, not technical expertise.

[23] The board found that Arthurs failed to take an "appropriate" physical examination or an "appropriate" medical history of the three patients for whom he prescribed controlled substances; that he failed to schedule appropriate return visits for those patients; and that he prescribed drugs that were inappropriate for the only diagnoses he recorded for those patients.

render the right of appeal completely inefficacious as well. A board of experts, sitting in a quasi-judicial capacity, cannot be silent witnesses as well as judges." *New Jersey Bd. of Optometrists* v. *Nemitz,* 21 N.J. Super. 18, 28 (1952). The board may put its expertise to use in evaluating the complexities of technical evidence. However, the board may not use its expertise as a substitute for evidence in the record. "The requirement for administrative decisions based on substantial evidence and reasoned findings — which alone make effective judicial review possible — would become lost in the haze of so-called expertise [if material facts known to the agency did not appear in the record]. Administrative expertise would then be on its way to becoming 'a monster which rules with no practical limits on its discretion.'" *Baltimore & Ohio R.R.* v. *Aberdeen & Rockfish R.R.,* 393 U.S. 87, 92 (1968), quoting from *Burlington Truck Lines, Inc.* v. *United States,* 371 U.S. 156, 167 (1962).

If an agency wishes to rely on a fact, that fact must be established by evidence in the record. An agency may introduce technical or specialized facts in the record through expert witnesses, or by taking official notice of facts. G. L. c. 30A, § 11 (5). Whatever method it chooses, the board must make certain that sufficient evidence is in the record for a court to review the evidence on which the agency relies.

As we read the board's decision, it concentrated on Arthurs's overprescribing, his failure properly to identify David and Charles Jackson, and the obvious mistakes in the patient cards concerning the prescriptions in evidence. The over-all facts and circumstances established by substantial evidence permitted the board to conclude that Arthurs was not acting for a legitimate medical purpose in prescribing controlled substances. Determinations as to the effect of conduct is essentially a matter of drawing inferences, and an agency's conclusions based on inferences will not be set aside by a reviewing court unless they are unreasonable. We

conclude that the inferences drawn by the board in this case are reasonable and are supported by substantial evidence.

2. *Reliance on the Baer decision.* Arthurs challenges the revocation of his license on the ground that the hearing officer, and the board, took notice "of general, technical or scientific facts" without notifying him of the materials so noticed as required by G. L. c. 30A, § 11 (5).[24] He also claims that the board is required to adopt such standards as it promulgated in *Matter of Baer,* Adjudicatory Case No. 205 (July 14, 1978), see note 25, *infra,* solely by rulemaking, and that it is not fair to judge Arthurs's conduct by criteria set forth in an adjudicatory case determined after that conduct had occurred.

In its decision, the board drew inferences from the findings of fact as to Arthurs's conduct. "[T]he Board is, as is any other trier of fact, accorded the power to draw reasonable inferences from the evidence before it." *NLRB* v. *Milk Drivers, Local 338,* 531 F.2d 1162, 1165 (2d Cir. 1976). "One of the purposes which lead to the creation of such boards is to have decisions based on evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." *American Broadcasting Cos.* v. *Writers Guild of America, West, Inc.,* 437 U.S. 411, 433 (1978), quoting from *Republic Aviation Corp.* v. *NLRB,* 324 U.S. 793, 800 (1945). *Radio Officers' Union* v. *NLRB,* 347 U.S. 17, 48-49 (1954). The board's conclusion that Arthurs prescribed controlled substances for other than legitimate medical purposes is a reasonable and permissible inference from the evidence. See *supra* at 308-

---

[24] General Laws c. 30A, § 11 (5), inserted by St. 1954, c. 681, § 1, provides: "Agencies may take notice of any fact which may be judicially noticed by the courts, and in addition, may take notice of general, technical or scientific facts within their specialized knowledge. Parties shall be notified of the material so noticed, and they shall be afforded an opportunity to contest the facts so noticed. Agencies may utilize their experience, technical competence, and specialized knowledge in the evaluation of the evidence presented to them."

309. The board based its holding on the *Baer* decision, which relies on case law,[25] not on expertise or technical knowledge. See note 22, *supra*. The inferences drawn from the evidence in this case were largely matters of common experience and common sense, not matters of specialized or technical knowledge.

Arthurs next argues that the board should have utilized rulemaking rather than adjudication in establishing standards for determining when a physician unlawfully prescribes controlled substances. We disagree. It is a recognized principle of administrative law that an agency may adopt policies through adjudication as well as through

---

[25] See *Matter of Baer*, Adjudicatory Case No. 205, at 15-16 (July 14, 1978). The factors *Baer* held to be relevant in making a determination that a physician had prescribed controlled substances without a legitimate medical purpose, and the cases from which those standards derive, include the following:

"(i) the physician's permitting the patient to name the drug he desires; see *Commonwealth* v. *Comins*, [371 Mass. 222, 233 (1976), cert. denied, 430 U.S. 946 (1977)]; *United States* v. *Ellzey*, 527 F.2d 1306 (6th Cir. 1976);

"(ii) the physician's expressing concern as to how and where a prescription would be filled in a manner which does not indicate a good faith concern for his patient; see *Commonwealth* v. *Comins*, *supra*; *Commonwealth* v. *Lozano*, [5 Mass. App. Ct. 872 (1977)]; *Commonwealth* v. *Miller*, [361 Mass. 644 (1972)]; *United States* v. *Bartee*, [479 F.2d 484 (10th Cir. 1973)].

"(iii) repeated refills over relatively short periods of time, *Comins*, *supra*; *Commonwealth* v. *Lozano*, *supra*; *United States* v. *Green*, 511 F.2d 1062 (7th Cir.) [cert. denied, 423 U.S. 1031 (1975)].

"(iv) general remarks of the physician indicating his experience with non-therapeutic uses of the drugs and of drug enforcement actions and procedures; *Comins*, *supra*; *Lozano*, *supra*.

"(v) failure to schedule appropriate appointments for return visits and other factors indicating a lack of interest in follow up care; *Lozano*, *supra*; *United States* v. *Moore*, 423 U.S. 122 (1975);

"(vi) conversations and other circumstances which demonstrate that the physician knew that the drugs were not to be used for therapeutic or medical purposes; *Miller*, *supra*; *Lozano*, *supra*; *United States* v. *Hooker*, 541 F.2d 300 (1st Cir. 1976); *United States* v. *Badia*, 490 F.2d 296 (1st Cir. 1973)."

rulemaking. *SEC* v. *Chenery Corp.*, 332 U.S. 194, 201-203
(1947). Accord, *NLRB* v. *Bell Aerospace Co.*, 416 U.S.
267, 291-294 (1974); *Maine Pub. Serv. Co.* v. *FPC*, 579
F.2d 659, 669 n.14 (1st Cir. 1978). Policies announced in
adjudicatory proceedings may serve as precedents for future
cases. See *NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759,
766 (1969); *Michigan Wisconsin Pipe Line Co.* v. *FPC*, 520
F.2d 84, 89 (D.C. Cir. 1975). Further, "the choice made
between proceeding by general rule or by individual, *ad hoc*
litigation is one that lies primarily in the informed discretion
of the administrative agency." *SEC* v. *Chenery Corp.*, 332
U.S. 194, 203 (1947). *NLRB* v. *Bell Aerospace Co.*, 416
U.S. 267, 294 (1974).[26]

We do not think it inappropriate, much less erroneous,
for the agency to use an ad hoc method of adjudication in
disciplinary cases arising out of a criminal statute which is
interpreted on an ad hoc basis by the courts. "It is the merit
of the common law that it decides the case first and deter-
mines the principle afterwards. . . . A well settled legal
doctrine embodies the work of many minds, and has been
tested in form as well as substance by trained critics whose
practical interest it is to resist it at every step. These are ad-
vantages the want of which cannot be supplied by any
faculty of generalization, however brilliant . . . ." *Matter
of Roche*, 381 Mass. 624, 639 n.16 (1980), quoting Justice
Oliver Wendell Holmes, Codes, And the Arrangement of
the Law, 5 Am. L. Rev. 1 (1870).

Since the board's decisions are public, see 243 Code Mass.
Regs. 1.04: (13) (1979),[27] the board is not at fault if persons

---

[26] The agency's choice is not always limited to adjudication or rule-
making. Agencies "intending to fill in the details or clear up an ambigui-
ty of an established policy" may issue interpretation or informational pro-
nouncements without going through the procedures required for the
promulgation of a regulation. See *Massachusetts Gen. Hosp.* v. *Rate Set-
ting Comm'n*, 371 Mass. 705, 707 (1977).

[27] Section 1.04: (13) states, in pertinent part: "The Board shall prepare
an official record of each adjudicatory hearing and maintain it for public

appearing before it are unaware of its decisions. Of course, it is helpful for the hearing officer to inform counsel of the opinions on which the hearing officer intends to rely. Arthurs had an opportunity[28] to argue that the inferences from the evidence of overprescribing, the failure to recognize a patient obtaining prescriptions under two names, and the failure to record prescriptions for controlled substances on patient cards, were not reasonable or, even if reasonable, should not be made by the board.

Arthurs also contends that, since the conduct which gave rise to the charges against him took place prior to the *Baer* decision, any reliance on the *Baer* standards is barred as an ex post facto ruling. The short answer is that disciplinary proceedings fall outside the scope of the ex post facto doctrine. *Hawker* v. *New York*, 170 U.S. 189, 197 (1898). *Foster* v. *Police Comm'rs*, 102 Cal. 483, 492 (1894). *Furnish* v. *Board of Medical Examiners*, 149 Cal. App. 2d 326, 330-331 (1957). The *Hawker* court, holding that a State may bar a convicted felon from the practice of medicine by way of legislation enacted after the individual's conviction, stated, "The State is not seeking to further punish a criminal, but only to protect its citizens from physicians of bad character." 170 U.S. at 196. Such a law is, rather than ex post facto, simply "retrospective insofar as it determines from the past conduct of the party his fitness for the proposed business." *Furnish, supra* at 331, quoting from *Foster, supra* at 492. Further, Arthurs's conduct was criminal under G. L. c. 94C, § 19 (a), and that statute was in effect prior to the conduct which culminated in discipline. Thus the board did not impose any new substantive liabilities on Arthurs. Cf. *Commonwealth* v. *Klein*,

─────────────────────────────

inspection. The record will contain . . . (e) Orders of the Board and the final decision of the Board with a statement of reasons."

[28] See 243 Code Mass. Regs. 1.05:(4)(b) (1979), which provides that "[t]he Board shall afford an opportunity to each party adversely affected [by a proposed decision] to file objections and to present argument, either orally or in writing at the Board's discretion, to the Board members who are to render the final decision."

372 Mass. 823, 833 (1977) (new standard of criminal con-
duct not applied retroactively because defendant not on
notice of possible criminality of his conduct). See also *Com-
monwealth* v. *Lewis*, 381 Mass. 411, 418 (1980).

3. *The board's denial of Arthurs's objections to the
recommended decision*. After the hearing officer filed the
recommended decision with the board, the board notified
Arthurs of his right to file objections to that decision.[29] Ar-
thurs then filed written objections and made oral objections
to the recommended decision. The board's final order,
which adopted the recommended decision, noted Arthurs's
objections, but did not specifically address or answer them.

Arthurs argues that the board erred by not providing an
adequate statement of reasons for overruling his objections.
We disagree. First, while the board is required to afford
parties adversely affected by a recommended decision of a
hearing officer the opportunity to file objections to the deci-
sion, see note 29, *supra*, nothing in the regulations govern-
ing the board's adjudicatory hearings requires the board to
respond specifically to those objections. Second, while
G. L. c. 30A, § 11 (8),[30] requires every agency decision to
be "accompanied by a statement of reasons for the
decision," that requirement was satisfied in this case by the
statement of reasons set forth in the hearing officer's recom-
mended decision, which the board adopted in its entirety.
General Laws c. 30A, § 11 (8), does not specifically require

---

[29] General Laws c. 30A, § 11 (7) (*b*), inserted by St. 1954, c. 681, § 1,
provides: "[A]n opportunity is afforded each party adversely affected to
file objections and to present argument, either orally or in writing as the
agency may order, to a majority of the officials who are to render the final
decision. The agency may by regulation provide that, unless parties make
written request in advance for the tentative or proposed decision, the
agency shall not be bound to comply with the procedures of this para-
graph." See 243 Code Mass. Regs. 1.05:(4)(b) (1979), *supra* at 314 n.28.

[30] Section 11 (8), inserted by St. 1954, c. 681, § 1, provides in pertinent
part: "Every agency decision shall be in writing or stated in the record.
The decision shall be accompanied by a statement of reasons for the deci-
sion, including determination of each issue of fact or law necessary to the
decision, unless the General Laws provide that the agency need not
prepare such statement in the absence of a timely request to do so."

that objections to a recommended decision be answered or
be accompanied by a statement of reasons, only that the
agency's final decision be accompanied by the required
statement of reasons. The board's failure to rebut Arthurs's
objections specifically, therefore, is not error.

Arthurs also argues that it was error for the board to have
overruled those objections since the board did not have a
copy of the hearing transcript when it made its ruling. The
simple answer is that there is no requirement in the State
Administrative Procedure Act that agency officials who are
to render a final decision must review the transcript before
ruling on objections to a proposed decision. Cf. G. L.
c. 30A, § 11 (7). Arthurs urges us to impose a rule of pro-
cedure on the board. The board is responsible to the public
for the discipline of physicians who abuse their obligations
and the responsibilities of their profession. Since the board
must "provide itself with the flexibility it needed to investi-
gate and to determine whether the public interest requires
the revocation of a physician's license," *Levy* v. *Board of
Registration & Discipline in Medicine*, 378 Mass. 519, 526
(1979), we defer to the board's determination as to how it
should proceed as long as its actions are consistent with the
requirements of due process and G. L. c. 30A. We decline
to impose a rule on the board which might unduly hamper
its effective functioning. See *Grocery Mfrs. of America,
Inc.* v. *Department of. Pub. Health*, 379 Mass. 70, 80
(1979).

4. *Double Jeopardy.* Arthurs argues that since he was
acquitted in 1977 of charges relating to the issuance of pre-
scriptions to Thomas Price (the undercover officer), and
since the indictments as to Charles and David Jackson, and
Gail Diamond were continued without a finding and then
dismissed, see *Commonwealth* v. *Brandano*, 359 Mass. 332
(1971), the principle of double jeopardy bars the board from
disciplining him. Arthurs claims that the disciplinary pro-
ceedings are punitive, and as such they are barred by the
outcome of judicial proceedings. Arthurs argues that, since
a person disciplined by a professional board is necessarily

humiliated and disgraced, disciplinary proceedings are essentially a form of punishment. While Arthurs may be correct as to the effect of such a proceeding on a disciplined professional, the purpose of discipline is not retribution but the protection of the public. The board is mandated to police the medical profession, and to take appropriate disciplinary action against those members of the profession "who do not live up to the solemn nature of their public trust." *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 528 (1979). The fact that discipline is painful does not alter the board's responsibility to consider a physician's qualification to practice medicine. The board may make that determination even in cases where the physician prevails in a judicial proceeding. See *Helvering* v. *Mitchell,* 303 U.S. 391, 397 (1938); *United States* v. *Naftalin,* 606 F.2d 809, 812 (8th Cir. 1979); *Younge* v. *State Bd. of Registration for the Healing Arts,* 451 S.W.2d 346 (Mo. Sup. 1969), cert. denied, 397 U.S. 922 (1970); *Strance* v. *New Mexico Bd. of Medical Examiners,* 83 N.M. 15 (1971).

5. *Entrapment.* Arthurs argues that the conduct of Thomas Price, the Massachusetts State Police Diversion Unit undercover detective, constituted entrapment.[31] Even assuming entrapment is a defense in a delicensure proceeding, see *Patty* v. *Board of Medical Examiners,* 9 Cal. 3d 356 (1973), the record does not support Arthurs's contention. To show entrapment, a defendant must show some evidence of government inducement, and "[m]ere evidence of solicitation is not enough to show inducement." *Commonwealth* v. *Thompson,* 382 Mass. 379, 385 (1981), quoting from *Commonwealth* v. *Miller,* 361 Mass. 644, 652 (1972). Here, there were no lengthy negotiations between Arthurs and Price, nor was there evidence that the govern-

---

[31] In his brief, Arthurs concedes that as to Charles and David Jackson, or Gail Diamond, entrapment is not applicable. He asserts, however, that if we conclude there was entrapment by Price, the board should reconsider the remaining evidence to determine if the evidence is substantial and warrants the same sanction.

ment "went beyond a simple request and pleaded or argued with the defendant." *Commonwealth* v. *Thompson, supra* at 385, quoting from *Commonwealth* v. *Miller, supra* at 652, quoting from *Kadis* v. *United States,* 373 F.2d 370, 374 (1st Cir. 1967). Cf. *United States* v. *Jannotti,* 501 F. Supp. 1182, 1193-1203 (E.D. Pa. 1980). Compare *Patty* v. *Board of Medical Examiners,* 9 Cal. 3d 356 (1973), with *Kee Wong* v. *State Bar of Cal.,* 15 Cal. 3d 528, 531 (1975).

The action is remanded to the single justice with directions to enter a judgment affirming the decision of the board revoking Alexander T. Arthurs's license to practice medicine.

*So ordered.*