ELIAS A. ALSABTI vs. BOARD OF REGISTRATION IN MEDICINE.

Suffolk.   December 5, 1988. — April 10, 1989.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Administrative Law*, Substantial evidence. *Physicians and Surgeons. Doctor*, License to practice medicine.

Substantial evidence supported the decision of the Board of Registration in
    Medicine to revoke a physician's license to practice medicine in the
    Commonwealth for his publishing in medical journals in 1979 while a
    graduate student a series of plagiarized articles, falsely authenticating
    scientific data, where that conduct called into question his ability to
    practice medicine within the meaning of G. L. c. 112, § 5 (*c*) and § 61,
    and 243 Code Mass. Regs. § 1.03 (5) (a) (3), and demonstrated that he
    lacked good moral character as required by G. L. c. 112, § 2. [553-555]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on March 11, 1988.

The case was reported by *Liacos*, J.

*Martha J. Koster* (*Kim V. Marrkand* with her) for the plaintiff.

*Jane S. Schacter*, Assistant Attorney General, for the defendant.

O'CONNOR, J. The Board of Registration in Medicine
(board) issued a final order revoking Elias A. Alsabti's license
to practice medicine in the Commonwealth. Alsabti petitioned
a single justice of this court for review of that order under
G. L. c. 112, § 64 (1986 ed.), and moved for summary judgment. The board filed a cross motion for summary judgment.
A single justice reserved and reported the case to this court
without decision. We affirm the board's order.

On February 4, 1987, the board issued an order to show
cause why Alsabti should not be disciplined for committing
plagiarism by publishing, under his name, three articles au-

thored by other physicians, and arbitrarily changing statistical and experimental data found in the articles, for purposes of furthering his medical career. The board claimed authority to take disciplinary action under G. L. c. 112, § 5 (c) (conduct which places into question the physician's competence to practice medicine) and § 61, and 243 Code Mass. Regs. § 1.03 (5) (a) (3) (1987) (gross misconduct in the practice of medicine) and § 1.03 (5) (a) (10) (1987) (practicing medicine deceitfully). The board also asserted authority under G. L. c. 112, § 2, to revoke licensure for lack of good moral character. Factual allegations regarding publication of another plagiarized article were subsequently added to the order to show cause. The board assigned the case to a hearing officer, and a hearing was scheduled for May 15, 1987.

On April 10, the board prosecutor and Alsabti's counsel offered a stipulation, subsequently amended, as to fact and sanction for the hearing officer's consideration. The stipulated sanction did not include revocation of Alsabti's license. On April 16, the day on which an answer to the order to show cause was due, Alsabti moved for submission of the matter without a hearing on the record and the stipulated agreement. The board prosecutor did not object, and requested that the record be closed and the case be decided on the existing record. A hearing officer ordered Alsabti to file an answer to the original order to show cause and Alsabti did so. Thereafter, the hearing officer issued a recommended decision concluding that Alsabti should be disciplined based on two alternative, independent grounds: conduct which calls into question his ability to practice medicine in violation of G. L. c. 112, §§ 5 (c) and 61, and 243 Code Mass. Regs. § 1.03 (5) (a) (3) (1987), and lack of the good moral character required by G. L. c. 112, § 2.[1] In response, Alsabti filed an objection to the

---

[1] General Laws c. 112, § 2, authorizes the board to deny licensure to a physician who lacks good moral character but does not expressly authorize other discipline on that ground. In *Raymond* v. *Board of Registration in Medicine*, 387 Mass. 708, 712-713 & n.4 (1982), we noted the board's authority to discipline a physician for lack of good moral character as reasonably related to its statutory mandate to promote the public health, safety, and welfare. Alsabti does not challenge the board's authority to discipline a physician for lack of good moral character.

recommended decision and also filed requested findings of fact and rulings of law. On February 3, 1988, the board issued a final decision and order adopting in full the hearing officer's recommended decision, and revoking Alsabti's certificate of registration to practice medicine in the Commonwealth. The board did not "foreclose the possibility that at some time [Alsabti] will be able to demonstrate his fitness to practice medicine."

Alsabti does not ask us to review the severity of the board's disciplinary action. The sole issue in this case is whether the board's decision to discipline Alsabti to any degree is supported by substantial evidence as required by G. L. c. 30A, § 14 (7) (e). " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). Under this standard, we must consider whether the board's conclusion that Alsabti's ability to practice medicine is questionable, as well as its conclusion that Alsabti lacks good moral character, "*could* have been made by reference to the logic of experience" (emphasis in original). *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). We must determine whether there is substantial evidence in the record to justify those conclusions after considering the entire record "tak[ing] into account whatever in the record fairly detracts" from the weight of the evidence on which the board relied. *Id.* at 466. *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966). "[A]s long as there is substantial evidence to support the findings of the agency, we will not substitute our views as to the facts." *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 304 (1981).

The facts set forth in the board's final decision and order may be summarized as follows. Alsabti graduated from medical school in 1980, and is currently licensed to practice medicine in Pennsylvania. From July 1 to October, 1980, he was an intern at a Massachusetts hospital. He has not practiced medicine in the Commonwealth since that time, and has no intention of doing so in the future. In 1979, four articles authored or coauthored by Alsabti were published in medical journals and listed in the "Index Medicus," with nine other

articles he published that year. The articles are substantially similar, except for immaterial changes in data, to four articles previously written by other authors. Three of those articles had been published in other medical journals. One had been filed as part of a grant application. Nowhere in Alsabti's articles did he acknowledge or cite to the work of the authors of the previous articles. Alsabti offered no explanation for the substantial similarity of the articles. In particular, he offered no evidence that his articles were the product of original and independent efforts. He has offered no articles for publication since 1979. In 1980, the "Index Medicus" listed seventeen articles authored by Alsabti. In 1981, no articles were listed. There is no evidence that Alsabti took any steps to retract or correct the record concerning the four articles in question. Each of the articles was submitted in 1978, when Alsabti was a graduate student. He was neither in medical school at that time, nor was he a physician. The articles were not submitted in fulfilment of any degree requirement. There is no explanation in the record for why he was not in medical school two years before his 1980 graduation.

The board's findings continue as follows. Alsabti is well regarded by his colleagues. The record contains letters from over twenty of Alsabti's patients, describing him as "sincere," "caring," "an outstanding physician . . . who has gone out of his way several times in order to treat members of my family," "cautious and patient . . . reliable and dependable . . . the most outstanding doctor I have known," "an asset to . . . [the] community," "will always recommend [him]," "[his services are] of the highest caliber, professionally, ethically and morally," and "one of the few doctors in the . . . area to accept patients who are on either medical assistance or medicare and accept their payment as full payment."

From these recited facts, the board concluded that "[b]y his pattern of conduct in publishing a series of plagiarized articles, in disregard of the fundamental virtues of intellectual honesty, professional integrity and respect for the advancement of scientific knowledge, [Alsabti] has demonstrated that he lacks good moral character which is required to practice medicine

as required by [G. L.] c. 112, § 2." The board also concluded that Alsabti "is guilty of conduct which calls into question his competence to practice medicine by his pattern of conduct in publishing a series of plagiarized articles, in violation of [G. L.] c. 112, § 5 (c) and [§] 61 and 243 CMR 1.03 (5)(a)(3)."

The board's assessment of the seriousness of Alsabti's plagiarism is evidenced by its express recognition that Alsabti's "conduct did not involve the isolated publication of a plagiarized article which might be characterized as a short-lived lapse in judgment or the product of innocent intentions. His publication of a series of plagiarized articles in the two-year period prior to graduation from medical school[2] makes sense only if treated as a systematic attempt to enhance his professional standing in the medical community." Further, the board noted that the plagiarism "certainly created the possibility that those who relied on his credentials to offer him a position were deceived. This possibility exists even if [Alsabti] did not directly represent that he had published, because independent inquiry may have disclosed this information or a reference may have relied on the publication in recommending [him]. Having once created the impression of a well-published expert, there is no evidence that [he] sought to reverse this impression. [His] dishonest advantage, even if it only influenced his employment in one position, has a compounding effect. One position improperly gained provides a stepping stone to successive positions. Along the way, other more qualified individuals are deprived of an opportunity to fairly compete. In the end, the quality of medical care may suffer."

The board focused on another harm flowing from Alsabti's conduct which it characterized as "more insidious" than the obtaining of an unfair competetive advantage. "The pursuit of truth in the scientific community depends on the integrity of those who contribute to the pool of common knowledge. By publishing, [Alsabti] misrepresented that the data and results of the research described in the articles were the legitimate

---

[2] The four plagiarized articles were published in 1979, that is, within the two-year period prior to Alsabti's graduation.

products of scientific endeavor. His publication had independent significance apart from the pre-existing body of knowledge. In giving life to research as his own, he gave credence to ideas without any scientific proof. Information introduced into the stream of intellectual commerce, despite being unworthy of attention, will be relied upon if it appears authoritative. The published articles of [Alsabti] had this misleading appearance. Even if the original work which [Alsabti] copied was meritorious, his efforts improperly validated the work. Instead of one work on the subject, there were two. The degree of acceptance of an idea, apart from its intrinsic worth, determines its place in the body of scientific knowledge. In the complex and changing world of scientific knowledge, it is difficult to estimate the effect of [Alsabti's] fraud. Intellectual dishonesty thwarts the efficient and systematic development of knowledge.

"What was said of the unfair advantage in employment is true in terms of an advantage in publishing. Had [Alsabti] not developed a track record of publications through the use of plagiarized articles, he might not have had the opportunity to publish the [seventeen] articles in 1980.

"Of significance in our consideration is the indifference to the values required of a physician evidenced by [Alsabti's] sustained misconduct. Instead of showing self-sacrifice and dedication to the goals of the profession, [Alsabti] displayed self-centered behavior designed as a shortcut to professional success. In place of a commitment to truth he demonstrated a cavalier disregard for the intellectual process involved in research."

Finally, the board noted that, while certain alterations in data in Alsabti's articles may be characterized as "immaterial," they are distortions of the truth, and reflect a "dishonest intent." The board equated Alsabti's plagiarism with data falsification, for which the board had previously revoked another physician's license, concluding that both activities are "distortions of legitimate scientific inquiry which impede the search for truth." The board also noted that, "in permitting the articles to circulate while he was a physician, [Alsabti] has for our purposes perpetuated the initial misrepresentation and continued the risk of reliance."

Alsabti's primary argument is that the board was unwarranted in making a "connection . . . between Dr. Alsabti's alleged plagiarism while a graduate student and his practice of medicine nearly ten years later." He argues that "[n]owhere in the record is there *any* evidence that Dr. Alsabti, as a physician, poses any threat to the public health, welfare and safety requiring revocation of his license. Absent such evidence the Board cannot find that Dr. Alsabti lacks the good moral character to practice medicine." (Emphasis in original.) Furthermore, Alsabti says, "the Board dismissed completely the uncontroverted evidence of Dr. Alsabti's patients that he is an exemplary physician." Finally, Alsabti contends that the board's conclusion that Alsabti's conduct calls into question his ability to practice medicine, within the meaning of G. L. c. 112, §§ 5 (c) and 61, and 243 Code Mass. Regs. § 1.03 (5) (a) (3) (1987), assumes the validity of the board's finding of Alsabti's lack of good moral character. Since that finding is unwarranted, he says, the conclusion is unwarranted as well.

Beyond question, good moral character is central to medical licensing because physicians must be held to possess "the highest degree of integrity." See *Levy* v. *Board of Registration & Discipline in Medicine*, 378 Mass. 519, 528 (1979). "Disciplining physicians for lack of good moral character, and for conduct that undermines public confidence in the integrity of the profession, is reasonably related to promotion of the public health, welfare, and safety. A physician's bad moral character may reasonably call into question his ability to practice medicine." *Raymond* v. *Board of Registration in Medicine*, 387 Mass. 708, 713 (1982).

It is apparent from its final decision and order that the board did not "dismiss[ ] completely" the evidence that Alsabti is highly regarded by his patients and colleagues. Rather the board concluded that those appraisals are outweighed by the gravity of the several acts of plagiarism shortly before Alsabti's graduation from medical school. The board was clearly justified in assessing as serious Alsabti's disregard at that time for basic fairness to competitors and for the possible consequences to patients who might be exposed to medical treatment by physi-

cians relying on experiments Alsabti purported to have done but never did. We must be extremely hesitant to dismiss a decision "made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration" *Haran* v. *Board of Registration in Medicine*, 398 Mass. 571, 579 (1986), quoting *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 311 (1981).

The board was not required to conclude from the letters written by Alsabti's patients and colleagues that he has undergone a conversion or transformation since the plagiarized articles were published. In *Matter of Hiss*, 368 Mass. 447, 460-461 (1975), a case in which a disbarred attorney sought readmission to the bar, we quoted *Matter of Keenan*, 313 Mass. 186, 219 (1943), saying that "[t]he judgment of disbarment 'continues to be evidence against . . . [the petitioner] with respect to lack of moral character at later times in accordance with the principle that "a state of things once proved to exist may generally be found to continue." *Galdston* v. *McCarthy*, 302 Mass. 36, 37 [1938]. Whatever the offense for which a judgment of disbarment was entered, the person disbarred has a heavy burden on a subsequent petition for admission to the bar to overcome by evidence the weight of the facts adjudicated by such judgment and to establish affirmatively that since his disbarment he has become a person proper to be held out by the court to the public as trustworthy' " (footnote omitted). We cannot properly say that the board erred in reasoning that, in light of his serious disregard ten years ago of the potential consequences of false authentication of scientific data, Alsabti had a heavy burden to prove his present good character to the board and he failed to sustain it. Surely, in the circumstances, the board had substantial evidence on which to conclude that Alsabti's conduct, although it occurred ten years ago, "calls into question" his current ability to engage in a profession requiring "the highest degree of integrity." *Levy* v. *Board of Registration & Discipline in Medicine*, *supra* at 528. We conclude that the board's decision is supported by substantial evidence. This case is remanded

to the single justice with instructions to enter a judgment affirming the decision of the board revoking the plaintiff's license to practice medicine in the Commonwealth.

*So ordered.*