JOHN W. WANG vs. BOARD OF REGISTRATION IN MEDICINE.

Suffolk. February 6, 1989. — May 4, 1989.

Present: LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Physicians and Surgeons. Doctor*, License to practice medicine. *Laches. Board of Registration in Medicine. Jurisdiction*, Nonresident.

The Board of Registration in Medicine was not deprived of jurisdiction to initiate a disciplinary proceeding against a physician by reason of the fact that the physician's license to practice medicine in the Commonwealth had expired. [17-20]

The principle of laches was not applicable to bar a disciplinary proceeding against a physician initiated by the Board of Registration in Medicine. [20]

A nonresident physician had sufficient "minimum contacts" with the Commonwealth so that the Board of Registration in Medicine, consistently with due process principles, properly initiated a disciplinary proceeding against him. [20-21]

Substantial evidence before the Board of Registration in Medicine supported the board's findings on charges of misconduct by a physician in the practice of medicine more than thirteen years earlier, and the board could properly conclude that the physician's substandard care of patients was so far-reaching that the charges reflected his present ability and fitness to practice medicine. [21-28]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 22, 1987.

The case was reported by *O'Connor*, J.

*Lee J. Dunn, Jr.* (*Richard W. Mable* with him) for the plaintiff.

*Douglas H. Wilkins*, Assistant Attorney General, for the defendant.

LIACOS, J. By an amended complaint, the plaintiff, John W. Wang, seeks judicial review of a decision of the Board of Registration in Medicine (board) revoking his registration to practice medicine in the Commonwealth. The plaintiff argues that the board lacked jurisdiction to initiate proceedings to revoke his registration to practice because his license had ex-

pired before the board initiated proceedings, and because the alleged misconduct occurred more than one decade earlier. The plaintiff argues further that, if the board did have jurisdiction, its decision was not supported by substantial evidence. A single justice of this court reserved and reported this case to the full court.[1]

The record reveals the following facts. In July, 1971, Wang joined the staff of St. Joseph's Hospital (hospital) in Lowell. At a May 21, 1974, meeting, the department of medicine of the hospital decided to recommend to the executive committee that the plaintiff's privileges be reduced from "M-1" to "M-3" status, whereby he would be allowed to admit, but required to transfer any patient to another physician within twenty-four hours of admission. With M-3 privileges, the plaintiff would not be entitled to read electrocardiograms.

The plaintiff filed suit in the Superior Court, on July 25, 1974, seeking to restrain the hospital from reducing his privileges. A Superior Court judge entered a preliminary injunction restraining the hospital from reducing Wang's privileges pending further hearings by hospital authorities and judicial review.

A hearing was convened before a medical committee of the hospital, with Dr. Bousquet, chief of the department of internal medicine, presiding. The plaintiff and his counsel participated in the discussion and questioned other participants. The medical department substantiated charges made against the plaintiff, and recommended to the executive committee that the plaintiff's staff privileges be reduced to M-3 status. The plaintiff's privileges were so reduced on April 4, 1975.

Wang then obtained an order in the Superior Court impounding all records in the case and enjoining the hospital from disclosing the reduction of privileges until a hearing on the merits. A Superior Court judge entered a directed verdict

---

[1] The parties have filed several motions with this appeal. The plaintiff filed a motion to supplement the record appendix, a motion to file a supplemental memorandum of law, and a motion to file a second supplemental memorandum. These motions are allowed. The board's motions to strike portions of the reply brief and to supplement that motion are denied.

against the plaintiff on June 22, 1982. By a letter dated July 20, 1982, the hospital informed the board of the April 4, 1975, reduction in the plaintiff's privileges.[2]

The board formally initiated disciplinary proceedings against the plaintiff by issuing an order to show cause on December 10, 1986. The board alleged that the hospital had curtailed the plaintiff's admitting privileges due to questions concerning his professional competence. The board alleged that (1) Wang falsely described his professional background by claiming he had been trained in the insertion of permanent pacemakers at Boston City Hospital; (2) on one or more occasions, Wang failed to respond to emergency calls; (3) Wang treated five patients inappropriately; and (4) on several occasions, Wang formed opinions as to patients' conditions based on information not contained in the patients' records, and misstated clinical results in one patient's record.

After a hearing, the board rejected the first allegation that Wang had misrepresented his credentials regarding the insertion of permanent pacemakers; it found against the plaintiff on the other charges. On March 16, 1988, the board revoked Wang's registration to practice medicine and his inchoate right to reestablish himself as a licensed physician simply by reregistering.

1. *The Board's Jurisdiction.*

The plaintiff argued before the board, and argues on appeal, that the lapse of his license prior to the board's issuance of an order to show cause deprived the board of jurisdiction to issue and proceed on its order to show cause. The board does not dispute that Dr. Wang's registration to practice medicine in Massachusetts lapsed well before the board initiated its ad-

---

[2] The plaintiff objects to this letter as an inappropriate basis for the board to institute its investigation, and cites G. L. c. 111, § 54B (1986 ed.), which requires that such a report be filed within thirty days of any action and that it include details of the date, nature, circumstances of, and reasons for, the action. We review the board's proceedings and decision and not that of the hospital. The letter's alleged lack of conformity with statutory requirements is not dispositive.

judicatory proceedings against the plaintiff on December 10, 1986.[3]

General Laws c. 112, § 5, mandates that the board "investigate all complaints relating to the proper practice of medicine by any person holding a certificate of registration." This provision is ambiguous in resolving the question before us because the statute fails to state explicitly whether the board's jurisdiction pertains to persons holding certificates at the time of the investigation or to persons holding certificates at the time of the alleged misconduct.

On his or her original application, a qualified applicant receives two entitlements, first to be registered as a qualified physician, and secondly, to receive a certificate of registration. G. L. c. 112, § 2. Under § 2, a registered physician must renew his or her certificate of registration every two years. "The certification of registration of any physician who does not file a completed renewal application together with the fee shall be automatically revoked, but *shall be revived upon completion of the renewal process*" (emphasis added). *Id.* We note that the statute does not prevent the plaintiff from applying for renewal even after his registration has expired, and that renewal may come years after the renewal period has lapsed. See 243 Code Mass. Regs. § 2.06 (2)(a) (1986) ("Revocation for failure to renew prohibits the licensee from practicing medicine until she [or he] has completed the renewal requirements").

The Supreme Court of Connecticut recently considered whether the Connecticut Medical Examining Board had jurisdiction to revoke the license of a Connecticut physician even though his license expired prior to the initiation of revocation proceedings. *Stern* v. *Medical Examining Bd.*, 208 Conn. 492, 493 (1988). The court held that the board had no jurisdiction

---

[3] There is some dispute concerning whether the plaintiff's registration expired in 1982, when the plaintiff failed to satisfy continuing medical education requirements, or in 1984, when the plaintiff failed to file his renewal fee. There was some evidence that the board considered Dr. Wang's license current in July, 1983. We need not resolve this question because we rely on the undisputed premise that the registration expired sometime before the issuance of the order to show cause.

to revoke the license. *Id.* at 497. Central to the court's conclusion was a statutory scheme stating that anyone who fails to renew his or her license, "shall be notified by the department that his [or her] license or certificate shall become *void* ninety days after the time for its renewal . . . unless it is so renewed. Any such license shall become *void* upon the expiration of such ninety-day period" (emphasis added). Conn. Gen. Stat. § 19a-88(f) (1987). This language contrasts sharply with the Massachusetts provision that the certificate of registration of a physician who fails to renew "shall be automatically *revoked*, but shall be *revived* upon completion of the renewal process" (emphasis added). G. L. c. 112, § 2. The Massachusetts statutory scheme leads us to conclude that the board retained jurisdiction over the plaintiff. The board's order revoking the plaintiff's registration, at a minimum, revoked Dr. Wang's inchoate right to reestablish his status as a licensed physician in Massachusetts simply by completing the renewal process.[4]

It is true, as the plaintiff argues, that the board could have waited to initiate proceedings against him until Wang filed an application for renewal. See 243 Code Mass. Regs. § 1.03(11) (1987) (stating that board can "refuse to renew a license pending a hearing on the question of revocation if the health, safety or welfare of the public necessitates such summary action"). We cannot say, however, as a matter of law, that the board must wait for Wang's renewal application to initiate disciplinary proceedings rather than doing so when his misconduct became known to the board.

---

[4] We note that courts have held, in varying circumstances, that licensees are not entitled to surrender their licenses as of right, during the pendency of disciplinary proceedings, in order to thwart agency jurisdiction. See, e.g., *California Pac. Collections, Inc.* v. *Powers*, 70 Cal. 2d 135, 139-140 (1969); *Cross* v. *State Bd. of Dental Examiners*, 37 Colo. App. 504, 508 (1976); *Boedy* v. *Department of Professional Regulation*, 433 So. 2d 544 (Fla. Dist. Ct. App. 1983); *In re Lewis*, 404 S.W.2d 469, 470 (Ky. Ct. App. 1966) (attorney not entitled to resign and escape the stigma of disbarment). Cf. *Matter of McKenney*, 384 Mass. 76, 80 (1981) (court unwilling permanently to bar retired judge from sitting again because judge's retirement carried "implicit abjuration of future judicial service").

The board's purpose is protection of the public interest, and when the board exercises its statutory function of conducting disciplinary proceedings, it is pursuing that purpose. *Alsabti* v. *Board of Registration in Medicine*, 404 Mass. 547, 548 & n.1 (1989). See *Raymond* v. *Board of Registration in Medicine*, 387 Mass. 708, 713 (1982). "[I]t is logical and sensible that, where such grave charges of . . . unprofessional or dishonorable conduct are alleged, the Board has the right to preserve [any] evidence . . . of these charges; otherwise witnesses may disappear and the passage of time itself may well dim or even eradicate the memory of the witnesses and thus preclude the construction of an adequate record." *Cross* v. *State Bd. of Dental Examiners*, 37 Colo. App. 504, 508 (1976). As the board's hearing officer who heard Wang's amended motion to dismiss stated, a jurisdictional standard must confer authority to discipline physicians who commit misconduct while fully licensed; otherwise a physician's obligation to respond to charges arising out of his or her licensure would be defeated and the board's public protection function would be frustrated.

The plaintiff argues further that the delay by the board in instituting its disciplinary proceedings constitutes a waiver and that the proceedings are barred by laches. We disagree. Laches is not generally a bar where a public right is being enforced. *Cullen* v. *Building Inspector of N. Attleborough*, 353 Mass. 671, 675 (1968). *Lincoln* v. *Giles*, 317 Mass. 185, 187 (1944). Furthermore, the hospital was enjoined as a result of the plaintiff's legal actions, from disclosing its reduction of the plaintiff's privileges until June, 1982. The board's delay until December, 1986, to conduct its investigation and to issue an order to show cause was lengthy, but not so inexcusable in these circumstances as to bar the proceedings.

Finally, the plaintiff objects to the board's jurisdiction on Federal and State constitutional due process principles. The plaintiff does, however, have sufficient "minimum contacts" with Massachusetts to satisfy constitutional due process. *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945). *Droukas* v. *Divers Training Academy, Inc.*, 375 Mass. 149, 152 (1978). Although the plaintiff now is a nonresident physi-

cian who challenges the revocation of his registration in this Commonwealth, he retained, until the board issued its decision, a right to renew his certificate of registration. Also, the alleged acts of misconduct occurred in Massachusetts during the more than eleven years he was licensed to practice in Massachusetts. He invoked the power of the Massachusetts courts between 1974 and 1982 to enjoin the hospital from disclosing information concerning his reduced status. We conclude that there was no violation of the plaintiff's due process rights.

2. *The Substantiality of the Evidence.*

The plaintiff claims that the board's decision to revoke his registration is not supported by substantial evidence and therefore should be set aside. G. L. c. 30A, § 14 (7) (*e*) (1986 ed.). " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6) (1986 ed). We have noted the limited nature of our review under the substantial evidence standard. "While we must consider the entire record, and must take into account whatever . . . detracts from the weight of the agency's opinion, *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966), as long as there is substantial evidence to support the findings of the agency, we will not substitute our views as to the facts. *Martin* v. *Director of the Div. of Employment Sec.*, 347 Mass. 264 (1964). *McCarthy* v. *Contributory Retirement Appeal Bd.*, 342 Mass. 45 (1961)." *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 304-305 (1981).

The following is a synopsis of the evidence presented at the hearing before the board, which included the testimony of Dr. Gerald Bousquet, chief of internal medicine at St. Joseph's Hospital, documentary evidence, medical records, and a transcript of the proceedings before the department of internal medicine and executive committee at the hospital.

From July, 1971, when he first joined the staff of St. Joseph's Hospital until December, 1973, the plaintiff did not use a telephone answering service. He relied, instead, on operators at the hospital switchboard to give and take messages. The nursing staff repeatedly complained that the plaintiff was not

available for his critically ill patients. Other physicians had to be called. Hospital records established that the plaintiff could not be reached by nurses on at least seven occasions for several hours ranging from over three hours to fifteen and one-half hours. The plaintiff was sought to respond to patients in the intensive care unit complaining of pain or other difficulty. The board concluded that Wang was not available for critically ill patients in the intensive care unit, as required of an M-1 physician.

There was also evidence presented at the hearing regarding the plaintiff's care and treatment of five patients at the hospital:

A. *"Cornelia."*

One female patient, "Cornelia," was admitted to the hospital complaining of chest pain, weight loss, and weakness. The plaintiff made a final diagnosis of "collagen disease" (connective tissue disease) with a secondary diagnosis of "hyperthyroidism" (overactive thyroid). Wang prescribed Propylthiouracil and Prednisone for the patient. Propylthiouracil has side effects including anemia, decreased platelet count, aplastic anemia, and hair loss which the patient eventually suffered. Prednisone is an extremely dangerous drug with significant side effects. Dr. Bousquet stated that the patient was discharged on potentially dangerous medication from which she suffered adverse side effects and for which she subsequently consulted the Lahey Clinic. A physician at the Lahey Clinic concluded that Cornelia did not have connective tissue disease and had normal thyroid function. The medications prescribed to her by Wang were withdrawn. Dr. Bousquet testified that there was no evidence to substantiate the diagnosis of hyperthyroidism. Dr. Bousquet testified as an expert witness that the plaintiff's treatment of Cornelia did not conform to the standards of good and accepted medical practice in 1974. The plaintiff made statements at the hospital committee hearing "that this [was] not [his] proudest case" and that he was "not very happy with [his own] management."

The board concluded that the diagnoses of an overactive thyroid and connective tissue disorder were not supported by the history, physical findings, or laboratory data. The board

also found that Wang had followed a course of medication without substantiating a basis for such treatment.

With regard to Cornelia, there was a further issue of an inconsistency between the laboratory reports and the plaintiff's discharge summary. The plaintiff indicated on the discharge summary that the patient's laboratory test results were elevated but the laboratory results actually indicated normal values on two different occasions. The board concluded that this inconsistency indicated, at a minimum, Wang's failure to exercise reasonable care.

B. *"Armand."*

A second patient, a seventy-seven year old male, "Armand," suffered multiple medical problems, including kidney disease. After a physical examination on February 22, 1973, the plaintiff prescribed Amphotericin to treat a systemic disease involving the presence of fungus. The plaintiff made his diagnosis on the basis of a blood smear. Evidence suggested that the fungus in this case was not detectable by a blood smear. The accepted tests for detecting such a condition are a blood culture and a tissue biopsy. The blood culture performed on March 7, 1973, indicated no growth after two weeks. No tissue biopsy was performed.

Wang's administration of Amphotericin with recognized nephrotoxic effects was questioned even during the course of treatment. Dr. Bousquet testified that, because of the drug's toxic nature, it should be used only in "life and death" situations. The plaintiff's own expert testified at the hospital committee hearing that the drug should be used only "with evidence of systemic infection and certain positive cultures." Dr. Bousquet concluded that the care rendered to Armand did not conform to the standards of good and accepted medical practice in 1974.

The board concluded that Wang did not establish that Armand had a systemic disease through accepted medical methods. The board also found that Wang followed a course of medication without substantiating a basis for treatment and without properly considering the adverse side effects of the medication. The board concluded further that Wang's assertion that he detected a systemic disease from a blood smear was a dishonest attempt to justify his diagnosis and treatment.

C. *"Beatrice."*

Two of the patients at issue were admitted under the plaintiff's care and treated for myocardial (heart) damage. One patient, "Beatrice," a forty-three year old female, suffered "acute chest pain with radiation down the arm." The plaintiff ruled out myocardial infarction (inadequate blood supply to the heart without destruction of tissue). The plaintiff placed the patient on Coumadin, an anticoagulant.

The plaintiff acted on the premise that Beatrice should be treated as a cardiac patient, and did not consider the possible coexistence of liver disease. The clinical evidence suggested that Beatrice should not have been treated as a cardiac patient. Dr. Bousquet testified that the first seventy-two hours of hospitalization indicated that this woman suffered from a liver, rather than cardiac, problem. Dr. Bousquet testified that Beatrice had all the laboratory hallmarks of some sort of liver disease including elevated alkaline phosphatase and low albumin, suggestive of chronic liver disease. Of particular significance was the patient's history of hospitalizations and psychiatric care with medication of tranquilizers.

Those reviewing the plaintiff's care of Beatrice found that she suffered from liver-related problems, not heart disease, and more significantly that the plaintiff's treatment was "totally inadequate" and "potentially hazardous to the patient" because of an increased risk of bleeding. Dr. Bousquet stated that the care rendered to Beatrice was substandard with respect to the standards of good and accepted medical practice in 1974.

The board concluded that Wang failed to consider properly Beatrice's history, the physical findings, or the laboratory data in making his diagnosis and in devising his treatment plan. The board also concluded that Wang followed a course of medication which presented unwarranted risks for Beatrice.

D. *"George."*

A second coronary patient, "George," was admitted to the intensive care unit under the plaintiff's care on June 6, 1974, with an admitting diagnosis of "acute inferior wall myocardial infarction and questionable bowel obstruction, and adhesions, rule out carcinoma."

The plaintiff had treated George on an out-patient basis and his previous problems seemed to focus on bowel difficulties — diarrhea and abdominal pain. Initial laboratory studies at the time of admission revealed abnormal liver and renal function tests, anemia, and very low potassium (indicating use of diuretics by an elderly person experiencing diarrhea). Dr. Bousquet stated that the plaintiff's treatment of this patient as a myocaridal infarction case did not make clinical sense after considering the fact that the intensive care unit nurses' notes did not indicate chest pain during the first eleven hours of admission, that his main complaint was that of bowel discomfort, and that his blood pressure and pulse were low. Three electrocardiograms did not disclose abnormalities suggestive of infarction.

The plaintiff placed the patient on Digoxin despite an increased risk of digitoxicity. Low potassium, from which the patient suffered, increased the likelihood of digitoxicity and its side effects, such as cardiac arrhythmia which is potentially fatal. Dr. Bousquet commented that the Digoxin should have been terminated and the patient's potassium levels increased. Dr. Bousquet concluded that the care rendered to George was substandard and did not conform to standards of good and accepted medical practice in 1974.

The board concluded that Wang did not adequately consider George's history, the physical findings, or the laboratory data in making a diagnosis and in establishing a treatment plan. Wang too hastily concluded that George's cardiac difficulties merited attention and prematurely foreclosed the question of bowel difficulties. The board also found that Wang followed a course of medication which placed this patient at risk without significant justification for such treatment.

E. *"Ernest."*

A fifth patient, a seventy-seven year old male, "Ernest," was admitted to the hospital on May 4, 1974, having been found after a fall. There was evidence that Ernest was very confused, weak, and anxious. Ernest was known to have Parkinson's disease and congestive heart failure for which he was receiving medication. The patient's immediate needs involved

observation and treatment of a leg abrasion. At the time of admission, the patient had a temperature of 101 degrees. Temperature readings dropped as of admission, and from May 10 through June 12 the patient had a normal temperature. During Ernest's hospitalization, while he was afebrile, the plaintiff prescribed Ampicillin for over two weeks to treat what the plaintiff diagnosed as staph septicemia (blood poisoning).

Dr. Bousquet testified that, although the plaintiff should have considered the possibility of an infection, he should have satisfied himself within seventy-two hours on the issue of infection. Blood and urine cultures, together with temperature readings, would have established whether the patient had an infection. The plaintiff made a diagnosis on the basis of one positive blood culture on May 15, 1974, when the patient was afebrile. The subsequent blood cultures were negative, indicating no growth and should have triggered concern that the initial result was a false positive caused by contamination. Dr. Bousquet believed that the diagnosis was not adequately documented by the one blood test, given the other circumstances in the case. The May 15 blood culture report the plaintiff received had shown that the staph organism was resistant to Ampicillin. As early as May 11, a utilization review questioned further hospitalization in view of the patient's normal temperature and no evidence of positive blood cultures. The plaintiff later transferred the patient to an ophthalmologist for cataract surgery.

Dr. Bousquet testified that the plaintiff's care of Ernest was substandard and did not conform to the standards of good and accepted medical practice in 1974. The plaintiff persisted in his own course of action, many times ignoring hospital by-laws. The hospital's repeated attempts to address its concerns through letters and conferences were unsuccessful.

The board concluded that Wang's diagnosis was not supported by clinical findings and laboratory data. Wang's course of medication was not indicated in the treatment of staph septicemia and was unwarranted in the circumstances. The board also concluded that Ernest's prolonged hospitalization was unwarranted. The board viewed Wang's actions as an effort to relieve himself of the responsibility for unwarranted hospitalization.

The board concluded that Dr. Wang, "by his pattern of substandard practice, his misguided judgment in attempting to cover up his errors and his failure to responsibly address patient care matters brought to his attention, is guilty of conduct which calls into question his competence to practice medicine," in violation of G. L. c. 112, § 5 (c), and 243 Code Mass. Regs § 1.03 (5)(a)(3).

Under G. L. c. 112, § 5 (c), the board has the authority to discipline a physician who is guilty of conduct which implicates his or her competence to practice medicine, including gross misconduct in the practice of medicine, and practicing medicine with gross incompetence or with gross negligence on one or repeated occasions. The board has, as does any trier of fact, "the power to draw reasonable inferences from the evidence before it." *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 311 (1981), citing *NLRB* v. *Milk Drivers & Dairy Employees, Local 338*, 531 F.2d 1162, 1165 (2d Cir. 1976). "One of the purposes which lead to the creation of such boards is to have decisions based on evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." *Arthurs*, *supra*, and cases cited therein.

Based on the facts presented to it, the board was warranted in concluding that Wang was not available to critically ill patients, that Wang repeatedly made diagnoses without following hospital guidelines and medical criteria, that he failed to pursue information which would have resulted in more accurate diagnoses, that he commenced medication for patients before substantiating the appropriate bases for such treatment, and that he exposed patients to contraindicated medication with adverse side effects. The evidence also supported the board's findings that Wang disregarded constructive criticism, refused to respond to patient care concerns, and made efforts to recast information in patients' records to justify his treatment.

Wang argues that because the evidence concerned events in 1973 and 1974, it does not bear on his present fitness to practice medicine. We disagree.[5]

---

[5] The more than thirteen years that passed between the time the events occurred and the board's issuance of its order to show cause, were due largely

The board specifically addressed and rejected the issue of the alleged staleness of the evidence, stating that these were not isolated instances of poor patient care. The board concluded that the substandard care was so far-reaching that the charges reflected Wang's present fitness and ability to practice medicine.[6] The serious nature of the charges warranted action by the board despite the passage of time. The charges pointed to Wang's dishonest and irresponsible attitude and reflected directly on his capacity to function as a physician. Cf. *Raymond* v. *Board of Registration in Medicine*, 387 Mass. 708, 712 (1982) (board warranted in concluding that conviction of knowing possession of two unregistered submachine guns called into question physician's ability to practice medicine); *Feldstein* v. *Board of Registration in Medicine*, 387 Mass. 339, 340-341 (1982) (conviction of making false representations to Department of Public Welfare, i.e, "double billing"); *Levy* v. *Board of Registration & Discipine in Medicine*, 378 Mass. 519, 526 (1979) (conviction of grand larceny from the Department of Public Welfare and of submitting false data to Rate Setting Commission).

The case is remanded to the Supreme Judicial Court for the county of Suffolk. A judgment is to enter affirming the board's order revoking Wang's registration to practice medicine and his inchoate right to reestablish himself as a licensed physician by reregistering.

*So ordered.*

---

to the hospital's nondisclosure, caused in turn by the injunction obtained by the plaintiff.

[6] Wang also argues that the board erred in revoking his license because it relied in part on the belief that Wang's poor medical practice was presumed to continue in the absence of evidence of his rehabilitation. We do not rely on this presumption in making our decision. See *Galdston* v. *McCarthy*, 302 Mass. 36, 37 (1938).

Furthermore, because Wang made no offer of proof to the board of his rehabilitation, we do not address the issue whether Wang should have been permitted to enter such evidence. Cf. *Uloth* v. *City Tank Corp.*, 376 Mass. 874, 884 (1978).