[No. 47789-7-I.   Division One.   January 22, 2002.]

JOHN D. BROWN, *Appellant*, v. THE CHIROPRACTIC QUALITY
ASSURANCE COMMISSION, *Respondent*.

*John D. Brown*, pro se.

*Christine O. Gregoire, Attorney General*, and *S.K. O'Neal*,
*Assistant*, for respondent.

PER CURIAM — John Brown appeals the trial court's decision affirming the Commission of Chiropractic Quality Assurance's (Commission) final order. The order revoked his license to practice as a chiropractor, imposed a $30,000 fine, ordered him to cease and desist from all actions falling within the chiropractic practice, and prohibited him from representing himself as a licensed chiropractor. Brown contends that (1) the Commission did not have jurisdiction over him because his license had expired, (2) the findings of fact are not supported by substantial evidence, and (3) the freedom to practice his religion prevents the State from regulating his practice. We affirm the Commission's order because it had jurisdiction to hear this matter, the administrative record contained substantial evidence, including the Commissioners' expertise, to support its findings, and the State has authority to regulate Brown's practices to protect the public health, safety, and welfare.

## FACTS

In January 1966, John Brown got his chiropractic license from the State of Washington. His license expired on July 3, 1993, and Brown has not renewed it. In February 1997, Patient A was suffering from headaches, and on the recommendation of her sister, Alison Falco, she went to the Alphabiotic New Life Center which Brown operates.

Patient A testified that Brown told her he had been a chiropractor for 20 years, but did not tell her that his license was expired. She also testified that she would not have sought his treatment if she had known he was unlicensed, that he referred to himself as "doctor," and that he had business cards that read "Dr. John D. Brown, Developmental Alphabioticist." Brown told her that the difference between chiropractic and alphabiotics was that only neck alignments were performed in alphabiotics.

On February 10, 1997, Patient A went to Brown for treatment of her headaches, and she filled out and signed a form containing biographical information. She testified that

she did not read all of it. She also admitted signing a form entitled "Comprehension," but said that she did not read it thoroughly. She stated that Brown handed her the forms without explaining their content, that she did not believe she was joining a religious organization, and that she would not have joined if she had known she was being asked to.

During treatment, Brown had Patient A lie on an inclined table while he placed his hands under her neck and turned her head from side to side. Brown placed one hand on her chin and one hand under her neck, turned her head to one side, and then forcefully pulled her head up to the table. He repeated this procedure after turning her head to the other side. Patient A testified that it was very similar to prior chiropractic treatment she received in New York.

Patient A testified that after paying Brown $20 for the treatment, she felt fine and her headaches and neck stiffness decreased. Brown did not warn her of the risk of stroke from the procedure he performed. She also stated that she did not believe she was making a donation, and there were no religious discussions, prayers, readings, or materials associated with her visit.

Patient A returned to Brown's facility four more times. He performed the same procedure each time, she paid $20 per visit, and there were no religious discussions. Following her fifth visit, Patient A suffered minor dizziness and neck pain. When she told Brown about it, he recommended she return for another treatment.

When she returned for her final treatment on March 12, 1997, Brown performed the same procedure. But this time, when he turned Patient A's head to the right and pulled her head up, she experienced immediate vertigo and nausea. She told Brown, and he told her to rest for a minute. Brown left the room, and when he returned, she was still suffering vertigo and nausea. Brown had to help her sit up because she was unable to do so alone. She vomited, sweated profusely, and could not feel her feet or left leg. She asked Brown to call Falco. He did so, but did not tell her it was urgent. When Falco arrived, she and another woman

helped Patient A into the restroom where she lost control of her bowels and continued to vomit. Brown knocked on the bathroom door and said, "You really need to get her home." He did not mention that she could have had a stroke, did not call 911, and did not advise Falco to take her to the emergency room.

Falco and Robert Freeman, Patient A's brother-in-law, took her home and, after consulting a physician, took her to the emergency room. Patient A was diagnosed with a stroke caused by dissections of both vertebral arteries which her physicians believe Brown's procedure caused. She was hospitalized for 11 days, did not work for a month, could work only part-time for two months, has had to reduce the intensity of her job, and has lost income. Patient A brought a civil action against Brown.

Falco and Freeman corroborated Patient A's testimony. They both testified to the procedures Brown performed on them, which they described as the same as those he performed on Patient A. They also testified that Brown referred to himself as a doctor and told them he had been a practicing chiropractor for 20 years without mentioning his expired license. They also signed his forms without reading them thoroughly, paid for their treatments, and had no religious discussions with Brown.

Brown did not deny any of these facts, except to state that he was not performing any form of treatment on Patient A, Falco, and Freeman, and that his pulling on the head was not forceful. He testified that he was performing the alphabiotic alignment process, and not a chiropractic adjustment. He also testified that the alphabiotic alignment process is a sacrament of the Alphabiotic Church and that Patient A, Falco, and Freeman were members of the church and acknowledged in the forms they signed that they were not receiving chiropractic or other treatment. He also said there were no materials in his office referring to chiropractic practice, and that all materials, diplomas, and documents referred to alphabiotics. He stated that he was trained in alphabiotics in Texas by Dr. Virgil Chrane and

others. After an eight-month training period, he was awarded a Doctor of Alphabiotics degree; that is the degree he refers to when he uses the title "Doctor." Brown stated that he learned the alphabiotic alignment process from Chrane, who was also a chiropractor.

On March 9, 1999, the Commission issued a statement of charges alleging that Brown committed unprofessional conduct by, among other things, practicing chiropractic medicine without a license, representing to his patients that he was a chiropractor when his license was expired, failing to exercise reasonable care when performing a chiropractic manipulation of Patient A's spine, failing to warn Patient A that she could suffer a stroke as a result of the manipulation, and failing to take proper emergency care procedures when Patient A displayed stroke symptoms. On January 27, 2000, there was an adjudicative hearing before a panel of four Commission members, which included three licensed chiropractors. Brown chose to represent himself at the hearing.

On March 14, 2000, the Commission issued its findings of fact, conclusions of law, and final order. It found that Brown's treatment was a chiropractic procedure, that he practiced chiropractic medicine without a license, that he misled Patient A into believing he was licensed, and that his treatment of Patient A was severely negligent. The Commission concluded Brown committed professional malpractice in violation of RCW 18.130.180(4), (7), (8)(a), (13); RCW 18.25.112(1), and RCW 18.25.011, revoked his license for 10 years, imposed a $30,000 fine, issued a cease and desist order prohibiting him from performing chiropractic procedures until his license is reinstated, and prohibited him from representing himself as a licensed chiropractor. Brown appealed the Commission's final order to superior court which affirmed the Commission. This appeal followed.

## DISCUSSION

The Commission concluded that Brown violated RCW 18.25.011 and RCW 18.130.180. RCW 18.25.011 provides

that "[i]t is a violation of RCW 18.130.190 for any person to practice chiropractic in this state unless the person has obtained a license as provided in this chapter." RCW 18-.130.180 pertains to "conduct, acts, or conditions [that] constitute unprofessional conduct for any license holder or applicant under the jurisdiction of this chapter." Brown maintains that the Commission lacked jurisdiction over his case because RCW 18.130.180 applies only to licensed chiropractors and his license was expired. He asserts that the Commission cannot both argue that he was in violation by practicing without a license and that as a license holder his conduct was unprofessional. We disagree.

The State argues that if the Commission is unable to investigate unlicensed persons for unprofessional conduct under RCW 18.130.180 until they seek reinstatement, evidence and witnesses will become stale or lost. Because the Secretary of the Department of Health has the same authority to investigate those practicing without a license as the Commission has to investigate unprofessional conduct, Brown argues that a Health Department investigation would preserve evidence and witnesses. The evidence the Secretary discovers could then be used to deny reinstatement. But this fact does not deprive the Commission of jurisdiction over persons with expired licenses.

The State contends that the Commission has jurisdiction over Brown under WAC 246-11-090(1) and that case law from other jurisdictions agrees. WAC 246-11-090(1) provides:

> The board has jurisdiction over all licenses issued by the board and over all holders of and applicants for licenses as provided in RCW 18.130.040(2)(b) and (3). *Such jurisdiction is retained even if* an applicant requests to withdraw the application, or *a licensee surrenders or fails to renew a license.*[1]

Brown asserts that the legislature did not give the Commission jurisdiction to make findings of unprofessional

---

[1] (Emphasis added.)

conduct under RCW 18.130.180 and RCW 18.130.050(2)[2] against an unlicensed person because the regulation conflicts with the statutes. This contention is without merit. RCW 18.130.050(2) gives the Commission authority to investigate and hold hearings on "all . . . reports of unprofessional conduct." Because the statute does not distinguish between expired and active licenses, it gives the Commission jurisdiction over any person who has held a license and appears to have engaged in unprofessional conduct.

In *Wang v. Board of Registration in Medicine*,[3] the Massachusetts Supreme Court faced the same issue. The physician contested the disciplinary board's jurisdiction because his license had expired before the board initiated proceedings against him. The *Wang* court concluded that the agency retained jurisdiction over the physician because, like RCW 18.130.050(2), a state statute authorized the board to " 'investigate all complaints relating to the proper practice of medicine by any person holding a certificate of registration.' "[4] Even though the physician failed to renew his license, it could be revived upon completion of the renewal process. Thus, the *Wang* court held that even though the physician did not have a license that could be revoked, the board had jurisdiction to revoke his "inchoate right to reestablish his status as a licensed physician in Massachusetts simply by completing the renewal process."[5] The *Wang* court also concluded that, while the board could wait to initiate proceedings until the physician filed for renewal,

> [w]e cannot say, however, as a matter of law, that the board must wait for Wang's renewal application to initiate disciplin-

---

[2] RCW 18.130.050(2) provides:

> The disciplining authority has the following authority:
>
> . . . .
>
> (2) To investigate all complaints or reports of unprofessional conduct as defined in this chapter and to hold hearings as provided in this chapter[.]

[3] 405 Mass. 15, 537 N.E.2d 1216 (1989).

[4] *Id.*, 537 N.E.2d at 1218 (quoting Mass. Gen. Laws ch. 112, § 5).

[5] *Id.* at 1219.

ary proceedings rather than doing so when his misconduct became known to the board.

The board's purpose is protection of the public interest, and when the board exercises its statutory function of conducting disciplinary proceedings, it is pursuing that purpose.[6]

The *Wang* court reasoned that

"[i]t is logical and sensible that, where such grave charges of . . . unprofessional or dishonorable conduct are alleged, the Board has the right to preserve [any] evidence . . . of these charges; otherwise witnesses may disappear and the passage of time itself may well dim or even eradicate the memory of the witnesses and thus preclude the construction of an adequate record."[7]

Brown argues that *Wang* is inapposite because Wang held his license when his unprofessional conduct occurred. He contends we should follow the Connecticut Supreme Court's decision in *Stern v. Connecticut Medical Examining Board*.[8] His argument is not persuasive. First, both Wang's and Brown's licenses had expired when disciplinary proceedings began. Second, the statutory scheme in *Stern* is different from ours. In Connecticut, when a physician does not renew his license within 90 days, it automatically becomes *void* under Connecticut law.[9] In both Washington and Massachusetts, the statutes provide that a license that is not renewed " 'shall be automatically revoked, but shall be revived upon completion of the renewal process.' "[10] As in *Wang*, a chiropractor with an expired license in Washington has an inchoate right to reestablish his status as a licensed chiropractor simply by completing the renewal process.[11]

---

[6] *Id.*

[7] *Id.* (alternations in original) (quoting *Cross v. Bd. of Dental Exam'rs*, 37 Colo. App. 504, 552 P.2d 38, 41 (1976)).

[8] 208 Conn. 492, 545 A.2d 1080 (1988).

[9] CONN. GEN. STAT. § 19a-88(f) (1987).

[10] *Wang*, 537 N.E.2d at 1219 (emphasis omitted) (quoting MASS. GEN. LAWS ch. 112, § 2).

[11] *See* RCW 43.70.280; RCW 18.122.140; WAC 246-12-040.

For the same public policy reasons the *Wang* court relied on, we hold that the Commission had jurisdiction over Brown.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions as provided in RCW 2.06.040.